UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL BUSINESS AVIATION ASSOCIATION, INC.,<br><br>                              Plaintiff,<br><br>              -against-<br><br>THE TOWN OF EAST HAMPTON,<br><br>                              Defendant. | No. _____<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff National Business Aviation Association, Inc. ("NBAA"), by and through its attorneys, Arnold & Porter Kaye Scholer LLP, states and alleges as follows:

**NATURE OF ACTION**

1.      For 84 years, the Town of East Hampton (the "Town") has owned and operated East Hampton Airport ("HTO Airport" or the "Airport") as a public use facility servicing the East End of Long Island. Indeed, HTO Airport, which opened in 1938, predates all major Long Island Airports, including LaGuardia Airport and John F. Kennedy International Airport.

2.      Despite the critical role that the Airport plays in the local economy and the national aviation system, the Town has hatched its latest scheme to restrict operations there to appease certain constituents. Previously prevented by this Court and the Second Circuit from imposing restrictions at the Airport because it failed to comply with the Airport Noise and Capacity Act of 1990 ("ANCA"), 49 U.S.C. §§ 47521-47533, the Town Board has now conjured a new plan—to impose noise and access restrictions through a 33-hour paper closure.

3.      However, ANCA's requirements do not dissipate through such procedural maneuvering. The Town's actions—yet again—are an impermissible attempt to circumvent

1

ANCA. The Court should enjoin the Town Board from doing indirectly what it previously enjoined the Town Board from doing directly.

## PARTIES

4.      Plaintiff NBAA is a non-for-profit corporation with its principal place of business in Washington, D.C. NBAA represents more than 11,000 companies and business aviation professionals, including some that operate aircraft at HTO that implicate the ANCA regulatory scheme.

5.      Defendant Town of East Hampton is a town on the east end of Long Island consisting of the village of East Hampton, the hamlets of Montauk, Amagansett, Wainscott, and Springs, and part of the incorporated village of Sag Harbor. The Town's legislative power is vested in a town board (the "Town Board") consisting of five members. The Town owns the East Hampton Airport.

## JURISDICTION AND VENUE

6.      Plaintiff's claims for declaratory and injunctive relief arise under the Declaratory Judgment Act, 28 U.S.C. § 2201, and this Court's inherent equitable powers. This Court has original jurisdiction over these claims pursuant to 28 U.S.C. § 1331.

7.      Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant Town of East Hampton is located in this District and the events giving rise to Plaintiff's claims occurred in this District. Plaintiff seeks emergency equitable relief against the Town, and a notice of claim pursuant to New York General Municipal Law § 50-e is not required.

## FACTUAL ALLEGATIONS

I.   **The Airport Has a Long-Standing History of Accepting Federal Funds for the Purpose of Broadly Accessible Public Use**

8.      Over its 84-year history, the Airport has welcomed the public and served commercial and recreational aircraft, providing economic, public safety, environmental, and other benefits to the Town of East Hampton and eastern Long Island.

9.      Located at 200 Daniels Hole Road in Wainscott, the Airport was constructed in 1936 with federal funds from the Works Progress Administration and opened in 1938 as one of the great public works projects of the New Deal era. From day one, the Airport was intended to be operated and maintained as a municipal airport for the use or benefit of the public.

10.      Today, the public use Airport encompasses 610-acres and has two active runways. It contains 62 hangars for parking, storage, and maintenance of aircraft, as well as a control tower (operated during the summer season). Approximately 30,000 take-offs and landings occur at the Airport annually, with the majority of the traffic taking place between the months of May to September. These aircraft fly a multitude of missions consistent with public-use airports around the country, including: emergency medical, law enforcement, government, recreational, passenger transport, utilities, aerial cinematography, real estate sales, electronic news gathering, and training.

11.      Because of its location, the Airport plays a critical role for regional and local commerce on Long Island and serves aircraft arriving from and departing to destinations throughout the United States and internationally. For many local business owners and residents, the Airport was an important feature in deciding where to locate their businesses or purchase their homes. It also has public service tenants, including the East Hampton Fire District Training Facility, the Aircraft Rescue and Firefighting facility, and the East Hampton Police. In addition, the Airport serves as a base for flight instruction and training, and enables medical, law

enforcement, and search-and-rescue personnel to be deployed rapidly to and from the communities it serves.

12.     The FAA has identified the Airport as "important to national air transportation" and included the Airport in its 2021–2025 National Plan of Integrated Airport Systems ("NPIAS"), a report the FAA provides to Congress. *See* FAA Report to Congress: National Plan of Integrated Airport Systems (NPIAS) 2021–2025, https://www.faa.gov/airports/planning_ capacity/npias/current/. The NPIAS also classifies the Airport as a "regional" "general aviation" airport, meaning that it "[s]upport[s] regional economies by connecting communities to regional and national markets," and that it has "high levels of activity with some jets and multiengine propellor aircraft."

13.     In recognition of its importance to national air transportation, the Airport has enjoyed significant federal support over the years, including funds for improvements.

14.     For example, shortly after its establishment, the Airport became important for "war emergency purposes" and received support from the FAA's predecessor, the Civil Aeronautics Administration. And as soon as Congress passed a law in 1982 allowing grants as part of the Airport Improvement Program ("AIP"), the Airport received such financial assistance, assuring the federal government in return that it would continue to operate consistent with its history, making "the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public."

15.     More recently, in 2001, the Town received an AIP grant of $1,410,000, at which time the Town again had to provide certain assurances—including a commitment to make the Airport available for public use on reasonable terms—for a period of 20 years.

II.     **ANCA Limits the Ability of Municipalities to Impose Noise and Access Restrictions at Public Airports**

16.     The federal government exercises exclusive sovereignty over the airspace of the United States, and federal law restricts local governments from, among other things, implementing airport noise or access restrictions pursuant to their traditional police powers.

17.     A local government acting as an airport proprietor may, under ANCA, propose noise or access restrictions. But they must be reasonable, nonarbitrary, nondiscriminatory, and consistent with ANCA's core mission of encouraging the growth and development of aviation. The congressional findings underpinning ANCA demonstrate that Congress viewed the act as a means of increasing national aviation capacity while accommodating reasonable local noise concerns if, and only if, they were consistent with that national purpose. Congress found, among other things, that "aviation noise management is crucial to the continued *increase in airport capacity*" and that "community noise concerns have led to uncoordinated and inconsistent restrictions on aviation that could impede the national air transportation system." 49 U.S.C. § 47521(1) – (4) (emphasis added).

18.     Accordingly, ANCA directs the U.S. Department of Transportation to establish a national aviation noise policy, including a program for reviewing airport noise and access restrictions on specific kinds of aircraft. Acting under the authority delegated to it, the FAA promulgated regulations with respect to the noticing, review, and approval of airport noise and access restrictions. *See* 14 C.F.R. Part 161.

19.     For example, federal laws and regulations have established uniform standards and procedures for the measurement of aircraft noise; a single system—using the Day-Night Average Sound Level noise metric—for determining the exposure of individuals to noise resulting from

airport operations; and standards for evaluating when residential property near an airport may be considered adversely affected by flight operations.

20.     In addition, ANCA establishes uniform procedures and systems of review by which airport proprietors may seek to implement noise and access restrictions. The nature of these procedures and systems of review turn on the extent of the noise produced by the particular aircraft to be regulated by the proposed restrictions.

21.     The FAA classifies aircraft into four "Stages" of noisiness, from Stage 1 (noisiest) to Stage 4 (quietest). This classification system serves Congress' goal of furthering noise abatement through technical developments (*i.e.*, encouraging more sophisticated and less noisy aircraft) instead of direct access restrictions. Before the Town's temporary closure, the East Hampton Airport accommodated all four classes.

22.     ANCA prohibits *any* access or noise restriction on Stage 2 aircraft (which include many types of helicopters) unless an airport proprietor prepares, publishes, and makes available for comment, at least 180 days prior to the effective date of the proposed restriction, a cost-benefit analysis of the proposed restriction, a description of alternative restrictions, and a comparison of the costs and benefits of the proposed restriction with those of the potential alternatives. *See* 14 C.F.R. § 161.205(1) – (3). As part of this analysis, the airport proprietor must prepare a study, using federally prescribed methods, of noise levels at the airport and surrounding areas, and of the exposure of individuals to noise created by airport operations.

23.     Access and noise restrictions on Stage 3 aircraft (which include many small planes) are subject to even more stringent procedural requirements. No such restrictions on Stage 3 aircraft operations may be implemented without either FAA approval or unanimous consent of all aircraft operators affected by the proposed restriction. And the FAA's review of proposed Stage 3

restrictions must evaluate specific factors. Thus, the Secretary of Transportation must "find[] on the basis of substantial evidence that

> (A) the restriction is reasonable, nonarbitrary, and nondiscriminatory;
> (B) the restriction does not create an unreasonable burden on interstate or foreign commerce;
> (C) the restriction is not inconsistent with maintaining the safe and efficient use of the navigable airspace;
> (D) the restriction does not conflict with a law or regulation of the United States;
> (E) an adequate opportunity has been provided for public comment on the restriction; and
> (F) the restriction does not create an unreasonable burden on the national aviation system.

49 U.S.C. § 47524(c)(2)(A)–(F). Proposed noise restrictions on Stage 4 aircraft require the same findings by the Secretary. The FAA has promulgated extensive regulations interpreting these statutory requirements and the analyses an airport proprietor must perform in order to satisfy them. *See* 14 C.F.R.§§ 161.305, 161.9(a).

## III. The Second Circuit Forbids the Town from Implementing Noise and Access Restrictions Without ANCA Compliance

24.     Despite HTO's utility and importance to the national aviation system, a minority of Town residents has loudly vocalized their complaints about the noise from the Airport.

25.     In 2013 and 2014, for example, approximately *half* of the Airport related noise complaints made to a Town-provided hotline came from only 10 households, with one household submitting approximately *2,800* complaints in a 12-month period (averaging about 7.5 complaints every day for one year). In 2020, of the noise complaints with sufficient data to identify households, the same percentage holds—with one household submitting *2,658* complaints in a 12-month period (averaging about 7.3 complaints every day for one year). The Town Board meeting minutes from May 11, 2021 indicate that a singular resident complains *daily* regarding the sea planes that fly over his home.

26.     Over the last two decades, the Town has made more than one attempt to evade its federal obligations—including those under ANCA—to address the complaints lodged by this small and intractable group.

27.     For example, in 2015, the Town enacted local laws designed to severely restrict access to the Airport through the imposition of mandatory curfews and trip limits. Specifically, the Town passed three local laws codifying restrictions: "(1) a mandatory curfew on all aircraft traffic, (2) an "extended" curfew for certain "noisy" aircraft, and (3) a weekly one-round-trip limit on noisy aircraft." *See Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 141 (2d Cir. 2016); *see also* Town of East Hampton, N.Y., Code §§ 75-38, 75-39 (2015).

28.     But those efforts ultimately failed before the Second Circuit. *See Friends,* 841 F.3d 133.

29.     First, the Second Circuit agreed that federal courts have equity jurisdiction to hear ANCA claims, because ANCA contains no explicit or implicit limitation on that jurisdiction. *Id.* at 144 (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015)).

30.     Next, the Court thoroughly rejected the Town's argument that ANCA's procedural requirements for implementing noise and access restrictions apply only to airport proprietors receiving federal funding. To the contrary, it found that ANCA "appl[ies] to *all* public airport proprietors *regardless of their funding eligibility*." *Friends*, 841 F.3d at 149. Even without federal funding the Second Circuit held that "the Airport would not be 'free to operate as it wishes' because the federal statutory limitations appl[y] regardless of whether an airport is subject to grant assurances." *Id.* at 139. The Second Circuit continued to hold that the statutory text and legislative history of ANCA confirmed that its procedures are "mandatory and comprehensive," and therefore preempt "local laws not enacted in compliance with them." *Id.* at 151–52.

31.     Having definitively established that ANCA applies to airports regardless of federal funding status, and that ANCA furthermore preempts local laws seeking to impose noise and access restrictions, the Second Circuit remanded the case to this Court for entry of a preliminary injunction against enforcement of all the Airport restrictions. *Id.* at 153–54.

32.     Ultimately, this Court entered a permanent injunction against enforcement of the Town Laws because they were preempted by ANCA. The Town is therefore prohibited from enforcing noise and access restrictions at HTO unless and until it complies with ANCA's procedural requirements.

## IV.    The Town Initiates a Closure-and-Reopen Strategy to Deal with Noise Complaints and Avoid ANCA

33.     Despite the permanent injunction in *Friends*, the Town remained undeterred. When the obligations imposed on the Town via AIP grant assurances expired on September 26, 2021, the Town Board perceived another opportunity to impose noise and access restrictions at the Airport. It initiated an "Airport Re-Envisioning Project" wherein it held a series of public workshops to, supposedly, receive input from community members and other stakeholders about the future of the Airport. But despite paying lip service to alternative options, the Town's intention from the get-go was clear—to assert "local control" and impose restrictions at the Airport to appease the vocal minority of residents unhappy with the Airport's operations.

34.     Plaintiff—as well as other organizations—made overtures to the Town to collaboratively work together with the aviation industry, the FAA and neighboring communities to develop solutions to address the Town's concerns. Among other options, Plaintiff and others suggested that the Town should consider whether Subpart B of Part 161 of FAA's regulations, which authorizes voluntary agreements between airport users and proprietors, provided an overlooked opportunity. However, the Town dismissed the notion of a Part 161 solution, stating in

9

a Town Resolution that it would "not achieve the Town's goal of obtaining maximum local control and utmost flexibility moving forward."

35.     On January 20, 2022, the Town Board voted to "temporarily" close HTO at the end of February. On February 1, 2022, the Town sent the FAA a Notice regarding this plan.

36.     On February 17, 2022, after multiple parties sued the Town to stop its lawless conduct, the Town voted to postpone the deactivation to May 17, 2022, allegedly to "reopen" a "new" and "private use" airport on May 19, 2022 (though still owned by the Town). The Town determined to then operate the facility on a Prior Permission Required ("PPR") basis, restricting the operations allowed at the Airport.

37.     The Town claims that this temporary closure and rebranding will extinguish all statutory obligations associated with a "public" airport. In support of its groundless position, the Town relies entirely upon a November 6, 2020 letter from the Director of the Federal Aviation Administration ("FAA") Eastern Region Airports Division (the "Fish Letter"), which vaguely identified the closing and reopening of the Airport as one possible option available to the Town, asserting that in such a scenario, "[t]he remaining FAA obligations, such as Exclusive Rights, Revenue Use, Civil Rights, are extinguished upon closure." No authority was cited for this proposition in the Fish Letter, and there was no suggestion that ANCA would be rendered inapplicable. Moreover, although the Fish Letter specifically refers to certain other statutory obligations, it makes no mention of ANCA.

38.     Nevertheless, the Town has insisted that it will proceed with its plans. On May 5, 2022, the Town officially adopted Rules and Regulations for East Hampton Town Airport, effective May 19, 2022. Under this regime, no operation may occur at the Airport unless such operation is permitted by the Town's PPR framework. These restrictions include limitations on the operations

of "noisy" aircraft; operation-based restrictions (e.g., limitations on commercial operations); aircraft-based restrictions (e.g., a ban on large jets); time-based restrictions for all aircraft (e.g., curfews); and punitive landing fees for all but the smallest fixed-wing aircraft. The rules implementing the restrictions are subject to enhancement "at any time."

39.     If the Rules and Regulations are violated, Chapter 75 of the Town Code contains the applicable penalties and enforcement process. Specifically, "any violation . . . shall, upon conviction, be punishable by a fine of not more than $250 or by imprisonment for a term not exceeding 10 days, or by both such fine and imprisonment." Moreover, "the Town may also maintain an action or proceeding in the name of the Town in a court of competent jurisdiction to compel compliance with or to restrain by injunction the violation" of the Rules and Regulations.

40.     This temporary closure and impending PPR framework are but a guise for the Town to evade its statutory obligations and impose aircraft noise and access restrictions that are contrary to federal law.

41.     Indeed, as early as May 11, 2021, the Town's outside counsel asserted that the Town could "accomplish the modified airport if we close it for a measurable amount of time and then we reopen it. Upon reopening, whether it's a public or private airport, we will have the ability to introduce new restrictions as a condition of opening. This would avoid ANCA issues."

42.     And in October 2021, the Town advised that once it reopened after a closure, it would "need to set specific policies for permission to use HTO," such as "implement[ing] curfews with [expanded] weekend hours," "restrict[ing] or creat[ing] limits on airport use by commercial users (quotas, slots, rationing, lottery, etc.)," and "noise-based restrictions."

43.     Recognizing what the Town was up to, on December 10, 2021, the Supervisor of the Town of Southampton wrote to the Town Board that the Town's "preferred alternative is not

full closure of the airport, but rather to simply wrest control of operations from the FAA in order to enact" "restrictions" and to "minimize[e] noise impacts to residents." The December 10 letter also described this maneuver as a "technical closure" intended to extinguish FAA assurances. *Id*. Similarly, news reports uniformly identify the Town's "goal" is to "reduce noise and pollution." Christopher Walsh, *East Hampton Likely to Temporarily Close Airport*, East Hampton Star (Oct. 21, 2021), online at https://www.easthamptonstar.com/government/20211021/east-hampton-likely-to-temporarily-close-airport.

44.     The restrictions imposed by the Town through the temporary closure ploy are nearly identical to the ones struck down as illegal in *Friends*. Evasion of ANCA's requirements is the *raison d'etre* of the plan to temporarily close the Airport.

**V.     The FAA Expresses Concerns About the Legality of Town's Scheme**

45.     Although the FAA has approved certain technicalities regarding the opening of the "new" airport, it has remained silent on the issue of ANCA. Indeed, on February 2, 2022, the FAA responded to the Town's Notice regarding the proposed closure of the Airport, characterizing the Town's plan as "novel" and expressing concern that the plan could "violate federal appropriations law."

46.     The FAA's response reiterated prior communications to the Town emphasizing that "the deactivation of the airport has genuine consequences." The FAA further noted that the issues surrounding statutory obligations are "unsettled" and that the Town has declined an opportunity to provide legal support regarding the "extinguishing" of federal statutory obligations. *See* Letter of Marie Kennington-Gardiner, FAA Eastern Region Administrator, to Peter Van Scoyoc (February 2, 2022). Nevertheless, the Town has insisted that it will proceed with its plans, despite the FAA's warning.

12

47. On March 18, 2022, a different FAA office issued a "Notice of Airspace Analysis Determination" which set forth procedures by which HTO could be converted to a "private use" airport without endangering safety, but which did not address if the Town legally could do so. *See* 14 C.F.R. § 157.7(a) ("[a] determination does not relieve the proponent of responsibility for compliance with … other Federal regulation"). Notably, this notice fails to mention ANCA.

## VI.  ANCA Applies to the Town's Actions at HTO

48. ANCA applies to publicly owned airports, including HTO, irrespective of their federal grant status or user base. *See, e.g.*, 14 C.F.R. § 161.3 ("The notice, review, and approval requirements set forth in this part apply to all airports imposing noise or access restrictions"); *see also Friends*, 841 F.3d at 149 ("ANCA's text and context unambiguously indicate Congress's intent for the § 47524 procedural mandates to apply to all public airport proprietors regardless of their funding eligibility."); *Naples v. FAA*, 409 F.3d 431, 434-35 (D.C. Cir. 2005).

49. Indeed, the Second Circuit previously held that ANCA applies to HTO Airport specifically.

50. The Town's close-and-reopen strategy is a transparent attempt to do indirectly what ANCA forbids it from doing directly—*i.e.*, to impose noise and access restrictions without complying with ANCA's requirements. ANCA prohibits both direct and indirect restrictions on aviation, absent compliance with Part 161. *See* Notice and Approval of Airport Noise and Access Restrictions, 56 Fed. Reg. 48661, 48663-64 (September 25, 1991) (ANCA "contemplates a broad review of restrictions including those that have an indirect effect on airport noise"); *see also* 14 C.F.R. § 161.5 (defining noise and access restrictions to include direct or indirect limits on aircraft within the scope of the statute).

51. The Town's scheme is a textbook violation of a "maxim" of equity and common sense: that a government body or actor cannot do indirectly what it is forbidden from doing

directly. *See, e.g.*, *Long Island Water Supply Co. v. City of Brooklyn*, 166 U.S. 685, 689 (1897) ("a state or municipality cannot do indirectly what it cannot do directly"); *Gelpcke v. City of Dubuque*, 68 U.S. 175, 192 (1863) ("It is almost unnecessary to say, that what the legislature cannot do directly, it cannot do indirectly").

52.     As the purpose and text of ANCA make clear, ANCA necessarily applies to the Town's closure-and-reopening strategy.

53.     *First*, the closure is itself a noise and access restriction covered by ANCA. The closure is, by definition, a restriction on the operation of Stage 2 and 3 aircraft (and, of course, all other aircraft) and a reduction of airport capacity. In preparing the closure scheme, the Town did not provide the requisite notice and did not comply with the publication or public comment requirements with respect to the closure's effect on Stage 2 aircraft operations. The Town did not conduct any of the required analyses or studies with respect to the closure's effect on either Stage 2 or Stage 3 aircraft. The Town did not obtain approval of the closure from the Secretary of Transportation or the unanimous consent of all affected aircraft operators.

54.     *Second,* while not every closure is necessarily one covered by ANCA, it is when it is noise motivated. Here, the purpose of the closure and subsequent transformation, as evidenced by the public statements of its sponsors and supporters, including the Town Board itself, is to do an end-run around the noise and access restrictions mandated by ANCA. The Town's outside counsel has acknowledged that HTO is the only publicly owned airport where a sponsor has attempted to transform from a public-use into a private-use facility, describing its plan as a "first-of-its-kind process."

55.     *Third*, the Rules and Regulations for East Hampton Town Airport, effective May 19, 2022, are precisely the types of noise and access restrictions that are covered under ANCA.

This is so even if they are imposed at a supposedly "private-use" airport. ANCA was enacted by Congress to prevent the piecemeal disassembly of the national system of airports via unilateral, parochial restrictions. ANCA was not intended to allow publicly owned airports to avoid its expansive mandates by simply declaring themselves "private-use" and thus no longer subject to the law.

**VII.    The Closure Causes Irreparable Harm to Plaintiff**

56.    The closure will cause irreparable harm to Plaintiff NBAA, whose members must be able to use HTO to serve their customers and maintain viable businesses.

57.    NBAA's members do not operate aircraft pursuant to a set schedule. Their services are provided on an ad hoc or charter basis, and therefore they fly to and from HTO at the convenience of their clients. But under the Town's restrictions, Plaintiff's members would be unable to use the airport for 13 hours on weekdays (from 8:00 p.m. to 9:00 a.m.) and 14 hours on weekends (from 7:00 p.m. to 9:00 a.m.)—in other words, the Town intends to implement an even more onerous curfew than the one at issue in *Friends*. The curfews would even prevent Plaintiff's members or customers from, for example, departing HTO at an hour sufficient to arrive in a New York City office at the start of an ordinary workday.

58.    Furthermore, certain NBAA members are frequently asked to fly to HTO multiple times a day, especially during the summer months. But the Town's proposed restrictions limit operators to a single round trip—*i.e.*, one takeoff and one landing at HTO—each day, regardless of the hour.

59.    Thus, the proposed restrictions would impose serious financial harm to Plaintiff's members' businesses, which may necessitate reductions in the sizes of their fleets, layoffs of pilots and other employees, and potentially reorganization of their businesses' operations. The proposed restrictions also threaten loss of business goodwill, which is not easily quantified.

60.     Additionally, the proposed restrictions will cause financial harms to local East Hampton, as well as serious nonfinancial harms in the ability of Plaintiff's members and their clients to use HTO for their personal enjoyment.

## CAUSE OF ACTION

### THE RESTRICTIONS ARE PREEMPTED BY ANCA

61.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 60 above as though fully set forth herein.

62.     State and local laws that interfere with or are contrary to federal law are invalid and unenforceable.

63.     The Town's actions in temporarily closing and "reopening" the Airport with restrictions is contrary to and interferes with federal law, including but not limited to ANCA and its implementing regulations.

64.     The closure is contrary to and interferes with federal policy and national aviation goals as expressed by, among other things, ANCA.

65.     In addition, as the temporary closure relates to the "route[s]" and "service[s]" of Plaintiff, it's members and their clients, it is expressly precluded and preempted by 49 U.S.C. § 41713(b)(1). The closure is not within the limited proprietor's exception, *id.* § 41713(b)(3), because it is unreasonable, arbitrary, and discriminatory.

66.     The closure is *per se* unreasonable and unlawful because it was enacted in violation of ANCA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendant and:

(a) Issue a declaration that the Town's attempt to close the Airport and to impose noise and access restrictions at the Airport is preempted by ANCA;

(b) Permanently enjoin the Town from closing the Airport and imposing restrictions until such time as the Town complies with the requirements of ANCA; and

(c) Such other relief as the Court may deem appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury for all issues so triable as a matter of right.

Dated: May 14, 2022

By

James D. Herschlein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
james.herschlein@arnoldporter.com

*Attorney for Plaintiff National Business Aviation Association, Inc.*