# Exhibit 10



**East Hampton Town Board**
159 Pantigo Road
East Hampton, NY  11937

**ADOPTED**

**RESOLUTION 2022-190**

Meeting: 01/20/22 11:00 AM
Department: Town Attorney
Category: Agreements, Contracts
Prepared By: Christina Arkinson
Initiator: John Jilnicki
Sponsors: Supervisor Peter Van Scoyoc
DOC ID: 27300 B

# SEQRA Negative Declaration to Deactivate EH Airport

SEQRA Negative Declaration to Deactivate East Hampton Airport and Open New Private Use Airport and Related FAA Required Action

WHEREAS, the expiration of Federal Aviation Administration (FAA) grant assurances for the East Hampton Airport (the "Airport") on September 25, 2021 provides the opportunity for the Town Board of the Town of East Hampton (the "Town") to re-examine the future use and operation of the Airport, including by closing the Airport and opening a New Airport at which the Town can study the impact of operational restrictions designed to minimize and/or avoid longstanding noise, environmental, safety, and other impacts;

WHEREAS, in a November 6, 2020, letter, the FAA has suggested that the Town pursue one of the following options concerning the future use of the Airport: "(1) Negotiation of an agreement for mandatory restrictions on aircraft operators per Part 161; (2) Closure of the airport after the grant assurances expires and the reopening of the airport as a private use airport; (3) Complete closure of the airport after the grant assurances expires (September 2021); or (4) Continue to operate the airport as a public use airport";

WHEREAS, since receiving that November 2020 letter from the FAA, the Town has on several occasions discussed the future of the Airport with the FAA, including with members of the FAA's Office of Regional Administrator, Office of Airport Planning and Programming, Air Traffic Organization, Office of Airports (headquarters and regional), Office of the Chief Counsel, Flight Standards District Office, and the Office of Airport Compliance and Management Analysis, to ensure the Town works in collaboration with the FAA and consistent with the processes outlined in the November 2020 letter and applicable law;

WHEREAS, in the course of these discussions, the FAA and Town identified a fifth option concerning the Airport's continued operation which includes transitioning the Airport from public use to private use without closing the Airport per 14 C.F.R. Part 157;

WHEREAS, after receiving the FAA's suggested paths forward and in reliance on the November 2020 letter, in 2021 the Town undertook a year-long Airport re-examination public engagement project (the "Project") with the goals of gathering and disseminating information to the public so that there would be a shared and accepted understanding of the essential facts related to the conditions at the Airport; facilitating discussion and consensus building on future plans for the Airport; soliciting and compiling public input on key issues surrounding the Airport and preference for the future; and developing alternatives for the future to assist the Town Board decision-making;

WHEREAS, as part of the Project, the Town conducted eight public work session meetings with presentations by professional consultants and four public community engagement sessions involving over 300 participants. It also established a dedicated email address for written public comments and a Town weblink for access to all documents and presentations related to the Project (https://ehamptonny.gov/748/Documents-and-Presentations) where 617 written comments were received;

Resolution 2022-190

Meeting of January 20, 2022

WHEREAS, the reports commissioned by the Town Board included: Overview and description of future alternatives by William O'Connor, Cooley LLP, May 11, 2021; Analysis of operations and noise complaint data by HMMH Consultants, May 11, 2021, "HMMH Review of Operations and Complaints; HMMH HTO Shoulder 2019 2020 Results"; Analysis of Jet Traffic by HMMH Consultants, May 13, 2021, "Addendum 2020 Summer Jet Traffic"; Evaluation of economic impacts by HRA Consultants, May 11, 2021, "HTO Economic Impact Analysis Summary Presentation 5.11.21" "HTO Economic Impact Analysis Full Presentation 5.11.21"; Update on PFC sampling and remediation by Nick Rigano, May 11, 2021; Update on Airport Operating Procedures by William O'Connor, July 6, 2021, "Operating Procedures Memo"; Carbon and Air Quality Emissions Assessment by Dr. Don Wuebbles, July 6, 2021, "Air Quality Presentation Dr. Don J. Wuebbles," "Air Quality Report Dr. Don J. Wuebbles"; Airport Environmental Conditions, Planning and Zoning Considerations By Lisa Liquori and Peter Flinker, August 3, 2021, "East Hampton Airport Draft Environmental Conditions, Planning & Zoning"; Draft Public Engagement Plan By Lisa Liquori, Fine Arts & Sciences and Peter Flinker, Dodson & Flinker, August 17, 2021; Airport Diversion Study HMMH Report September 6th, 2021 - Feasibility Study for the Diversion of Aircraft Operations at East Hampton Airport; HTO Legal Update Post Grant Assurances presentation by William O'Connor, Cooley LLP, October 19, 2021; Draft Public Engagement Process Summary 10.12.2021 By Fine Arts & Sciences, Dodson & Flinker; Review of the Draft Public Engagement Report By Lisa Liquori and Peter Flinker, December 21, 2021; and East Hampton Town Study of Airport Passengers by ARA - August 2021;

WHEREAS, members of the public provided the Town with additional studies responsive to the Town's consultant reports, including, GEI Data Air Quality Analysis Report, August 25, 2021; Review of Report Titled "Carbon and Air Quality Emissions for East Hampton NY and Its Airport"; Contribution of the East Hampton Airport to the East Hampton/Southampton Economy prepared by EBP US, December 14, 2020; and East Hampton Airport Diversion Study prepared by Garvett & Associates LLC, September 14, 2021; all of which have been reviewed and considered by members of the Town Board;

WHEREAS, the Town believes that the community is best served by obtaining maximum local control over the Airport such that the Town will have the utmost flexibility to address community concerns moving forward;

WHEREAS, from among the options suggested by the FAA as available to the Town, the Town believes, based on thorough review of public comment and consultant reports, that closing (or "deactivating") the Airport and opening it as a new private use facility ("New Airport")-Option 2 suggested by the FAA-achieves the Town's goals of obtaining maximum local control, retaining flexibility to control aeronautical activities in East Hampton in the future, and protecting the community in the most comprehensive and effective manner, while also preserving a continuation of aviation services;

WHEREAS, the Option 2 approach allows the Town to have maximum flexibility at the New Airport because, among other reasons including those set forth in the November 2020 letter sent to the Town from the FAA, this process allows the Town to "use the remaining funds in the airport account as it desires" because all "remaining FAA obligations, such as Exclusive Rights, Revenue Use, Civil Rights, are extinguished upon closure";

Resolution 2022-190                          Meeting of January 20, 2022

WHEREAS, once the New Airport is operating, the Town will utilize a "prior permission required" framework, as suggested in the November 2020 letter from the FAA, that enables the Town to consider restrictions and limitations at the New Airport based on inter alia time of day, type of aircraft, type of operation, noise impacts, and/or environmental impacts; this prior permission required framework would be subject to adjustment by the Town as needed to ensure that the community's needs are being met and
that advances in aviation technology, if any, are appropriately considered by future Town Boards and that such Town Boards have the flexibility needed to continue striking the right balance between the community and aviation stakeholders. The SEQRA GEIS process outlined below will help inform the Town how best to implement these decisions in the future;

WHEREAS, based on thorough review of public comment and consultant reports, the Town believes that the first option suggested by the FAA in the November 2020 letter was not desirable because, among other reasons, the Town is not a Part 139 airport and thus it does not receive regularly scheduled operators, meaning that identifying all operators who use the Airport is not feasible; moreover, even if a
voluntary agreement could be reached with currently known operators, it would be ineffective against any
new commercial operator entrants at the Airport as explained in the November 2020 FAA letter; and seeking voluntary agreements does not achieve the Town's goal of obtaining maximum local control and utmost flexibility moving forward;

WHEREAS, based on thorough review of public comment and consultant reports, the Town believes that the third option suggested by the FAA in the November 2020 letter is, at this time, unnecessary because public comments and professional studies suggest that a balance can be struck between aviation
stakeholders and the community such that implementing restrictions or other limitations on operations can address much of the community's concern without foreclosing the ability of certain operators to continue operating out of the New Airport;
WHEREAS, based on thorough review of public comment and consultant reports, the Town believes that the fourth option suggested by the FAA in the November 2020 letter is not reflective of the community's
interests regarding the Airport and that change at the Airport is necessary to respond to the community's valid concerns regarding noise, the environment, safety, and other issues;

WHEREAS, based on thorough review of public comment and consultant reports, the Town believes that the subsequently identified fifth option suggested by the FAA in discussions following receipt of the November 2020 letter is not suitable as it does not achieve the Town's goal of obtaining maximum local control and utmost flexibility moving forward at the New Airport, namely, because it would require the Town to remain subject to certain federal oversight that is not present under the Option 2 approach that the Town believes is preferable;

WHEREAS, to effectuate this change in status under applicable FAA rules, and based on continuing discussions with FAA representatives, the Town has determined that it is in the public interest to temporarily close (or "deactivate") the Airport for a period of three days at the beginning of March 2022 (March 1, 2, and 3) and then open a New Airport as a

Resolution 2022-190                                    Meeting of January 20, 2022

private use airport, thereby giving the Town the maximum flexibility possible in determining how to proceed with future airport operations. Such temporary closure and opening of a New Airport does not commit the Town to any specific future operational change that may impact the environment;

WHEREAS, the timing considerations regarding the closure of the Airport and opening of the New Airport were discussed with the FAA and the FAA confirmed that such timing was within the discretion of the Town Board;

WHEREAS, the Town's judgment to close the Airport for three days in early March (March 1, 2, and 3) before opening a New Airport will ensure all remaining federal statutory obligations are "extinguished," but also ensures that aviation would be disrupted as little as possible given that historical operations during this off-season Tuesday - Thursday time period show an average of 22 operations per day, 66 % of which are small, piston-driven aircraft;

WHEREAS, the Town Board chose this time period and duration for closure, after reviewing historical flight data and in part, to ensure that any flight operations to the East End of Long Island would not cause a significant adverse environmental impact to other airports or communities in the East End due to the low likelihood of a material amount of flight diversions;

WHEREAS, the New York State Environmental Quality Review Act (ECL Article 8 and its implementing regulations in 6 NYCRR Part 617) (collectively, "SEQRA") is applicable to discretionary decisions of a local agency such as the Town Board unless exempted by the SEQRA regulations. After exercising due diligence, the East Hampton Town Board determined it is the only State or local agency with a discretionary decision concerning the long term operation of the Airport and thus, is the SEQRA lead agency. The FAA as a federal agency, is not subject to SEQRA. When an agency has before it a complex set of decisions affecting management of public resources some of which may pose the potential for one or more significant adverse environmental effects, SEQRA offers the option of the use of a Generic Environmental Impact Statement to evaluate the potential environmental effects of alternative management options. Based on the numerous Airport related studies undertaken by the Town to date and the extensive public comments the Town Board has received from a wide spectrum of interested residents and business interests, the Town Board believes the preparation and review of a Generic Environmental Impact Statement ("GEIS") is warranted. The SEQRA process envisions several steps in development and public review of a GEIS: (1) the preparation of a Draft Scoping Outline for the Draft GEIS and public review and comment thereon leading to a Final Scoping Outline; (2) preparation of the Draft GEIS itself, including all needed studies identified in the Final Scope; (3) public review and comment on the published Draft GEIS; (4) the preparation of a Final GEIS responding to public comments received on the Draft GEIS and containing any revisions determined necessary by the Town Board; and (5) adoption of a SEQRA Findings Statement considering the Final GEIS prior to adopting any changes to long term Airport operations;

WHEREAS, in contemplation of the preparation of a DGEIS, the Town Board has directed its consultants to prepare a Full EAF, SEQRA Positive Declaration and Draft Scoping Outline related to the consideration of long term operational changes at the New Airport that is reflective of the concerns in the extensive public comments received to date. The

Resolution 2022-190                                    Meeting of January 20, 2022

Draft Scoping outline will be the subject of public meetings and public comment period to be scheduled by the Town Board on or about February, 2022. The Draft Scoping outline will identify the Town Board's preliminary thoughts on alternatives and the studies and investigations it believes will be necessary to fully evaluate potential changes in operation to reduce or eliminate direct significant environmental impacts from operation of the New Airport and any indirect significant consequential environmental impacts that may occur elsewhere. These include: continuation of the same operations that were permissible at the Airport (no action under SEQRA), limitations on aircraft type, operation type, or hours to avoid or mitigate noise, environmental, safety, or other impacts, to closure of the New Airport and repurposing of the airport lands for non-aeronautical use;

WHEREAS, while a decision to close the public use Airport and open a private use New Airport under FAA rules is a discretionary action of the Town and therefore requires consideration of potential impacts under SEQRA, it does not commit the Town to a future course of actions that will affect the environment, but instead provides greater autonomy for the Town's operational authority. The Town Board will utilize the Final Generic Environmental Impact Statement and SEQRA Findings Statement to guide its decisions on final future operational changes at the New Airport. The Town Board believes that opening a private use New Airport will not in and of itself have any significant adverse environmental effects and can be permissibly segmented from the consideration of any long-term operational changes which will be evaluated in the DGEIS as set forth in 6 NYCRR §617.3(g)(1). A Full Environmental Assessment Form and Negative Declaration have been prepared that carefully consider whether closing the Airport and opening a New Airport as outlined in the FAA's November 2020 letter would potentially have a significant adverse impact on the environment (see Appendix A to this Resolution). Coupled with the prospective adoption of a Positive Declaration to examine the environmental, economic and social effects of potential changes to future operation of the New Airport, such permissible segmentation under SEQRA is no less protective of the environment.

NOW, THEREFORE, BE IT RESOLVED, that the Town Board declares itself the SEQRA lead agency for review of any changes to the status of the Airport and any future changes in operations at the New Airport; and be it

FURTHER RESOLVED, that the Town Board, after careful review and consideration, hereby adopts the attached SEQRA Negative Declaration (Appendix A) in relation to following FAA procedures for pursuing Option 2 set forth in the FAA's November 2020 letter, and be it

FURTHER RESOLVED, that in respect to the long term operation of the New Airport, the Town's Airport consultants are directed to prepare a Full EAF, Positive Declaration and Draft Scoping Outline for review and approval by the Town Board and scheduling of a public comment period and public meeting thereon in or about February, 2022; and be it,

FURTHER RESOLVED, that the Town will file the appropriate Form 7480-1 with the FAA to initiate the deactivation of the Airport and opening of a private use New Airport and work in conjunction with the FAA to complete the status change; and be it,

Resolution 2022-190                                     Meeting of January 20, 2022

FURTHER RESOLVED, that the Town Attorney and the Town's Airport consultants assist the Town Clerk in drafting, publishing and circulating required SEQRA and other notices as applicable

| RESULT: | ADOPTED [UNANIMOUS] |
|---|---|
| MOVER: | Peter Van Scoyoc, Supervisor |
| SECONDER: | Sylvia Overby, Councilwoman |
| AYES: | Burke-Gonzalez, Lys, Overby, Rogers, Van Scoyoc |

Environmental Assessment Form Part 2 and Part 3        Airport Deactivation and Opening of New Airport
Supplemental Information
January xx, 2022
**Brief Description of Proposed Action (include purpose or need):**

Increased traffic at the East Hampton Airport ("Airport") in recent years has created growing concerns about noise pollution, public health, safety, environmental and climate change impacts. These impacts are not well-aligned with East Hampton's identity as a resort community, and its commitment to sustaining the quality of life and the quiet enjoyment of its rich natural, cultural, and scenic resources. The Airport also provides positive values to the community including employment, economic and recreation opportunities as well as access for emergency, medical and civilian services.

Expiration of Federal Aviation Administration ("FAA") grant assurances in September 2021 has provided the Town Board with the opportunity to re-examine the future of the Airport including the opportunity to close the Airport and open a new private use airport ("New Airport"), at which time the Town Board will be federally permitted to study the impact of operational changes designed to minimize and/or avoid longstanding noise and other impacts. By letter dated November 6, 2020, and in the course of subsequent discussions between the Town Board and the FAA, the FAA has suggested five (5) options for the Town to consider concerning the future of the Airport.

After conducting a one year-long public engagement process to examine the Airport during 2021, the Town Board proposes to deactivate the public use Airport and open a private use New Airport, one of the five options suggested by the FAA in the November 2020 letter and an option that has been discussed with the FAA several times since receipt of the letter (the "Action"). This option provides the Town with the broadest level of local controls over future management operations and maximum flexibility to adjust restrictions at the New Airport as desired by the community. To effectuate this change of status under applicable FAA rules, the Town Board proposes to close the Airport on February 28, 2022 and open the private use New Airport on the morning of March 4, 2022.

Closing the Airport and opening the New Airport will not itself change any regulations or practices when compared to the old Airport. No changes to the permissible aviation operations will result from subject action. No physical changes or improvements to the facilities or infrastructure are proposed. No changes to the personnel are contemplated. The Action does not commit the Town Board to any future course of action. There will be no material changes in the scope of permitted activities as a result of the closure of the Airport and opening of a New Airport. Instead, the closure of the Airport and opening of the New Airport is necessary to obtain local control and permit the Town Board to exercise discretion over operations at the private airport under the FAA's regulatory scheme. The short duration of time during which no airport will be available is consistent with the time during which regular airport maintenance practices may require an airport to be closed. The closure of the Airport and opening of the New Airport comprises a discretionary action on the part of the Town Board and is classified as an Unlisted Action pursuant to SEQRA. The potential environmental impacts of this Unlisted Action are examined in this expanded Environmental Assessment Form.

Page **1** of **11**

Environmental Assessment Form Part 2 and Part 3                    Airport Deactivation and Opening of
New Airport
Supplemental Information
January xx, 2022

As mentioned, the Town Board has chosen to deactivate the public use Airport and open a private use New Airport in order to obtain the broadest level of controls over future management operations and potential restrictions to respond to community needs and goals. While no change in management operations or restrictions are contemplated at this time, the Town Board also proposes to collect and analyze basic data related to a range of potential future management options. The collection, analysis, and assessment of the potential environmental impacts of this basic data and potential future management options will not in any way commit the Town Board to undertake, fund or approve any actions. Thus, the proposed information collection is classified as a Type II Action pursuant to SEQRA.

Notwithstanding this assessment, the Town Board anticipates that, at some future date after a thorough analysis of the information collected, it may be desirable to implement management and regulatory changes at the New Airport. The SEQRA regulations provide the option of the use of a Generic Environmental Impact Statement to evaluate the potential environmental effects of alternative management options. Thus, the Town Board proposes to professionally study and evaluate through the preparation of a Generic Environmental Impact Statement (GEIS) a range of alternative regulatory and management options that could be implemented at the New Airport under a Prior Permission Required ("PPR") framework. A separate and companion Full Environmental Assessment and Positive Declaration will be prepared for the potential future actions contemplated by the Town Board, including how the PPR framework will be implemented and how such implementation impacts the community and/or neighboring airports. The range of potential actions are briefly described as ranging from full closure to curfews or restrictions of certain aircraft to the No Action Alternative (i.e., no changes to operations compared to those in effect as of January 18, 2022).

The data collection and analysis of alternatives GEIS study is proposed as a separate action from the Action subject to this Environmental Assessment- that is the deactivation of the public use Airport and the opening of a New Airport. According to the SEQRA regulations, considering two actions involving related components separately is considered "segmentation." While the SEQRA regulations generally direct Lead Agencies to review and evaluate the potential environmental impacts of a "whole action" even if it involves a number of actions that may not be presented at the same time, the regulations also set forth special circumstances when considering a part or segment of the overall action is *not* contrary to the intent of SEQRA. In this case, after the Town Board deactivates the public use Airport and opens a New Airport, the Town Board has no definitive plans on what may happen in the future. Potential future actions, such as curfews or limitations on noisy aircraft, are speculative. After the study of potential impacts of alternatives, the Town Board may choose to do nothing, that is not to adopt new management regulations. Deactivating the public use Airport and opening a New Airport is functionally independent of any future regulatory action. Together, these circumstances indicate that a segmented approach to SEQRA is warranted. Before enacting permanent regulatory changes at the New Airport, the Town Board will collect and analyze data on a range of alternatives in a GEIS subject to all the procedures and regulations set forth by the SEQRA laws.

**Expanded Environmental Assessment Form Part 2 & Part 3**
Page **2** of **11**

Environmental Assessment Form Part 2 and Part 3                    Airport Deactivation and Opening of
New Airport
Supplemental Information
January xx, 2022

1. **Impact on Land**- No permanent physical changes, improvements or alternations are proposed. Upon closure of the Airport, temporary signs, markers and/or equipment will be installed in accordance with FAA standards to denote a closure of all air navigation facilities. In order to enact the closures, runway closure markers, also known as a "portable lighted runway markers," may be used. This airport marking aid may be placed at the entrance of a closed taxiway and is fueled by a diesel engine or solar powered battery. Lighted runway closures consist of four arms spanning 14 feet apiece, contain a total of 20 spotlights and are able to beam over 70,000 candelas, the unit of the luminous intensity. The "lighted cross'- adjustable lights" can be lit during the day, or night, and are visible to aircraft anywhere from 10-25 miles away. This ensures a pilot can see when a runway is closed and reroute accordingly.

2. **Impact on Geological Features**- No permanent physical changes, improvements, or alterations are proposed, and no permanent regulatory changes are proposed. Therefore, no impacts on geological features will occur.

3. **Impact on Surface Water**- No permanent physical changes, improvements, or alterations are proposed, and no permanent regulatory changes are proposed. Therefore, no impacts to surface waters will occur.

4. **Impact on Groundwater**- No permanent physical changes, improvements or alterations are proposed, and no permanent regulatory changes are proposed. Therefore, no impacts to groundwater resources will occur.

5. **Impact on Flooding -**No permanent physical changes, improvements, or alterations are proposed, and no permanent regulatory changes are proposed. Therefore, no impacts contributing to flooding will occur.

6. **Impact on Air**- No permanent physical changes, improvements or alterations are proposed, and no permanent regulatory changes are proposed. Therefore, no adverse impacts to air quality resources will occur. To the contrary, the absence of an airport for 3 days will reduce the greenhouse gases and air pollutants generated by aircraft. Air quality impacts from aircraft potentially diverting to nearby airports is expected to be minimal as the analysis on Diversion Impacts, discussed in the Transportation section of this analysis, indicates that overall diversion or aircraft impacts to be minimal.

7. **Impact on Plants & Animals-** No permanent physical changes, improvements, or alterations are proposed, and no permanent regulatory changes are proposed. Therefore, no impacts on plants and animals will occur.

8. **Impact on Agricultural Resources-** No permanent physical changes, improvements, or alterations are proposed, and no permanent regulatory changes are proposed. Therefore, no impacts to agricultural resources will occur.

9. **Impact on Aesthetic Resources-** No permanent physical changes, improvements, or alterations are proposed, and no permanent regulatory changes are proposed. Therefore, no impacts to aesthetic resources will occur.

10. **Impact on Historic and Archaeological Resources-** No permanent physical changes, improvements, or alterations are proposed, and no permanent regulatory changes are proposed. Therefore, no impacts to historic or archaeological resources will occur.

11. **Impact on Open Space and Recreation-** No permanent physical changes, improvements, or alterations are proposed, and no permanent regulatory changes are proposed. Therefore, no impacts to open space and recreational resources will occur.

12. **Impact on Critical Environmental Areas-** No permanent physical changes, improvements, or alterations are proposed, and no permanent regulatory changes are proposed. Therefore, no impacts to critical environmental areas will occur.

13. **Impact on Transportation-** Closing the public use Airport and opening the private use New Airport will have no adverse impacts on transportation. This action itself will not change any regulations or practices when comparing historical operations at the Airport with the initial operating framework at the New Airport.

    The proposed closure of the Airport and opening of a New Airport three (3) days later is consistent with the time during which regular airport maintenance practices may require a closure for maintenance work. Generally speaking, under the application of SEQRA regulations, regular or routine maintenance, not involving new programs or major reordering of priorities, is considered to have negligible or no environmental impacts and is exempt from SEQRA review as a Type II action.

**Potential Diversion Impacts**

Notwithstanding the above assessment, potential diversion impacts resulting from closing the Airport and opening a New Airport three (3) days later, have been evaluated. The Town of East Hampton has been tracking aircraft operations at the Airport for decades. Activity at the Airport is highly seasonal with approximately 75 percent of all aircraft operations occurring between the months of May and September with 25 percent of all operations usually occurring in August. The lowest amount of activity occurs in the months of February and March and the days having the lowest activity are Tuesday through Thursday. The period during which no airport will be available,

Environmental Assessment Form Part 2 and Part 3          Airport Deactivation and Opening of
New Airport
Supplemental Information
January xx, 2022

March 1- 3, 2022, corresponds to the historically lowest levels of aircraft activity at the Airport.
Thus, the absence of an airport during this limited time period of low historic activity corresponds to
the time period when there will be the least amount of potential diversion impacts to other airports
and other modes of transportation. Further, aircraft operators and their passengers have a variety of
potential responses to the time period during which no airport exists. Among their options, they
can change the timing of their flights. Alternatively, they can use another airport. It is this potential
diversion to other nearby airports that is further evaluated for potential adverse environmental
impacts below.

In order to evaluate potential impacts from diversion, an assessment of the Vector VNOS data of
aircraft operations, collected for the Airport was conducted for the 6 years between 2016 and 2021.
The days selected for this historical comparison fall between the Tuesday through Thursday time
period within the last week of February or the first week of March to align with the period proposed
during which no airport is available for aeronautical users.

Over this 6-year period of time, the average number of total aircraft operations for the comparable
3-day time period were 65 flights, divided equally between 32 landings and 32 departures (due to
rounding in averages, the number of departures and takeoffs is one less than total flights). The
average number of flights per day was 22, divided equally between 11 landings and 11 departures.
By way of comparison, during one random day of operations during a recent peak summer season,
July 19, 2019, there were 395 total operations (divided approximately equally between landings and
takeoffs). This level of activity is eighteen-fold higher than the average operations in early
March/late February, or stated another way, in the past, the early March time period has seen less
than 6% of the operations experienced during peak period activity. During the 3-day time period
proposed for no airport availability, approximately 47 percent of the total aircraft operations were
made by locally based aircraft. These activities are not likely to divert to another airport but would
likely reschedule for another day in East Hampton. Further, data indicates that approximately 66
percent of the operations were small piston-driven aircraft.

An evaluation of the potential impacts from diversion of aircraft during this 3-day time period on
surrounding airports follows. For the surrounding airports, this assessment is based on the best
available data available supplied to the FAA *and* assessments made by HMMH in the *Feasibility
Study for the Diversion of Flight Operations at East Hampton Airport* report, dated September 6,
2021.

**Montauk Airport (MTP)-**
According to Montauk Airport's filed FAA Form 5010, the airport supported 30,361 operations
between July 2018 and June 2019. Applying the assumption that 25 percent of these operations
occurred during the peak month of August, the airport supported 245 operations per day or 16
operations per hour in the peak month on average. The peak summer population in Montauk swells
as much as ten times compared to the year-round population, an increase larger than the other

Page **5** of 11

hamlets in East Hampton. While there is no exact figure available for seasonal variation in aircraft operations at the Montauk Airport, it is safe to assume that they are similar, if not more exaggerated, than the large seasonal fluctuations that exist at the Airport. Applying the seasonal variability figures from the Airport to MTP, it is estimated that the daily number of operations in early March is approximately 14 flights. Even if all 22 of the estimated daily operations at the Airport were diverted to Montauk during the 3-day period during which no airport is available, the total of 36 daily operations represents 1*5 percent of the total daily operations that MTP experiences in the peak summer season* i.e., 36 compared to 245. Further, as previously stated, it can be expected that approximately 47 percent of the East Hampton operations will not be diverted during a 3-day closure, thus a maximum of 11 daily flights might reasonably be expected to potentially divert to MTP, a figure less than the *hourly rate* of operations during a typical day in August. In addition, the limited infrastructure- (i.e.- lack of fueling facilities, limited runway length, lack of passenger terminal-) will curb the number and type of aircraft, such as jets, which would choose to divert operations to Montauk. Finally, some of the passengers flying into East Hampton may be heading to Southampton and may chose to divert their flights to Gabreski as it is closer to their final destination.

In short, in the time period during which no Airport will be available in East Hampton, a very minor amount of air traffic could be expected to divert to Montauk airport. As the number of operations during early March is a fraction of the number occurring during the peak season at MTP, the projected number of diverted aircraft could be accommodated easily. Further, there are a number of other factors, including airport location and lack of facilities, which are likely to further reduce the number of potential flights that will divert to Montauk airport. The small number of potential flights that could be diverted will not cause an adverse impact to MTP or Montauk.

**Gabreski Airport (FOK)**

According to Gabreski Airport's filed FAA Form 5010, the airport supported 63,602 operations in 2018. Applying the assumption that 25 percent of these operations occurred during the peak month of August, the airport supported 2513 operations per day or 34.2 operations per hour in the peak month. Gabreski airport is on 1,451 acres, the largest of the nearby airports and offers the most extensive facilities and amenities. Briefly, FOK has:

- 3 active runways including one 9,000 feet long- which is among Long Island's longest after JFK International
- On-site fueling facilities
- 24/7 operational and staffed control tower
- Passenger terminal with a restaurant
- Car rental companies
- 24-hour security provided by Suffolk County Sheriff's Office
- On-site Suffolk County Police Department and Air National Guard

If all of the 22 estimated daily operations during the March 1 – 3 time period were diverted to Gabreski, the increase in operations would be less than the number already accommodated during one hour during the peak month. Further, it is anticipated that approximately 47 percent of the East Hampton Airport operations during the 3-day closure period would choose to reschedule their flights rather than divert to another airport.

In short, closure of the Airport between March 1 - 3, 2022, could result in a very minor amount of air traffic diverting to Gabreski. The number of operations that could be diverted from East Hampton Airport during early March is a fraction of the number occurring during the peak season at FOK and a number smaller than the hourly operations occurring during the peak season at FOK. The small number of increased activities that could be diverted will not cause an adverse impact to FOK or the surrounding area.

**Mattituck Airport (21N)**

According to Mattituck Airport's filed FAA Form 5010, the airport supported 12,200 operations between July 2018 and June 2019. Applying the assumption that 25 percent of these operations occurred during the peak month of August, the airport supported 98 operations per day or 6.6 operations per hour on average. As with the other nearby airports, the seasonal difference in operations provides a large amount of extra potential capacity in early March. Moreover, given Mattituck's size, runway conditions, available services and facilities, and location (-two ferry rides and 30 miles away from East Hampton-) it is reasonable to assume that many operations that could potentially occur at East Hampton Airport would not choose to operate at Mattituck.

In short, the seasonal difference in operations at Mattituck provides ample capacity to accept additional operations during early March without an adverse impact. But, more significantly, given the size, conditions, lack of services, facilities, and location, it is not likely that many aircraft would choose to divert their operations to Mattituck during the time period during which no airport in East Hampton will be available.

**Southampton Heliport (87N)**

According to Southampton Heliport's filed FAA Form 5010, the airport supported 400 operations between October 2015 and September 2016. Applying the assumption that 25 percent of these operations occurred during the peak month of August, the heliport supported approximately three operations per day.

In the time period during which no airport will be available, the number of helicopters using the Airport has historically been negligible- with zero helicopters using the Airport on some days. On average, there have been approximately one (1) helicopter landing per day. Similar to the nearby airports, operations at Southampton Heliport are highly seasonal. But, in the event that even one helicopter flight per day

Environmental Assessment Form Part 2 and Part 3                Airport Deactivation and Opening of
New Airport
Supplemental Information
January xx, 2022

was diverted to Southampton Helipad, it is anticipated that it could be accommodated without adverse
impacts due to the extra capacity available between peak activity and March usage.

**Potential Ground Transportation and Traffic Impacts**

As mentioned above, the proposed closure of the Airport and opening of a New Airport three (3) days
later is consistent with regular airport maintenance practices during which time airports are temporarily
closed for maintenance work. Generally speaking, under the application of SEQRA regulations, regular or
routine maintenance, not involving new programs or major reordering of priorities, is considered to
have negligible or no environmental impacts and is exempt from SEQRA review as a Type II action.

Notwithstanding this assessment, an evaluation of potential impacts on ground transportation has been
conducted. For the purposes of characterizing its road network, East Hampton Town has been described
as one long cul-de-sac terminating at Montauk Point. There is one primary roadway in and out, NY State
Route 27, Montauk Highway. The data published on the NYSDOT Traffic Data Viewer for Montauk
Highway indicates that Montauk Highway in the vicinity of the Airport (Station 070160, 540 feet west of
Georgica Road, year 2015) experiences an average of 21,334 vehicle trips per day, or average annual
daily trips ("AADT"). This figure is divided between an average of 10,228 vehicular trips per day traveling
westbound and 11,106 vehicular trips per day eastbound. Clearly, if all the passengers historically flying
to East Hampton during the 3-day closure period were to switch to automobiles, there would not be a
noticeable difference or adverse impact on Montauk Highway traffic.

Although there will be no anticipated impacts to Montauk Highway in the vicinity of the Airport, an
evaluation was also made for Wainscott Northwest Road, one of the local roadways leading to the
airport. According to the NYSDOT Traffic Data Viewer there were an average of 1,771 vehicular trips per
day, AADT, on Wainscott Northwest Road extending from Wainscott Stone Road to Industrial Road in
2019. Here again, the potential additional vehicle trips from passengers displaced would be negligible.

**Ground transportation impacts on nearby airports**

**Montauk Airport (MTP)-** To assess potential impacts on the road network from potential diversion
from the Airport to Montauk Airport located on East Lake Drive, an examination of the AADT of
Montauk Highway in the vicinity of East Lake Drive was made. The NYSDOT Traffic Data Viewer
reports there were an average of 2,254 vehicle trips per day (Station 070292 ,712 feet east of East
Lake Drive, year 2017), divided between 1,124 average vehicles westbound and 1,130 vehicles
eastbound. An estimate for 2019 indicated the AADT rose to 2,270 vehicles per day for both
directions.

Assessing East Lake Drive, the NYSDOT Traffic Data Viewer reports 3,155 average vehicle trips per
day (Station 071402, 690 feet south of Paradise Lane, year 2015) divided between 1,567
southbound and 1,588 northbound.

In short, the potential additional motor vehicle trips to and from Montauk Airport that might be expected as a result of the potential diversion of aircraft operations during the 3-day closure is minimal and will not have an adverse impact on traffic in the area.

**Gabreski Airport (FOK)-** As already assessed in the Potential Diversion Impacts section of this analysis, Gabreski supports 34 aircraft operations per hour in August. Even if all the aircraft with East Hampton as a destination were diverted to Gabreski during the contemplated 3-day closure period, it would not add as many flights per day as currently accommodated per one hour in August. Further, Gabreski is served by both Montauk Highway and Sunrise Highway, having a much larger vehicle capacity and traffic flow than Montauk Highway in East Hampton. For example, the AADT on Sunrise Highway in the vicinity of Gabreski Airport has an AADT of 43,260 vehicles (Station 070151 located 1.45 miles w. of CR-31, year 2015).

In short, the potential motor vehicle trips to and from Gabreski that may be projected due to the potential diversion of aircraft operations during the 3-day closure period is miniscule and no adverse impacts to traffic are anticipated.

**Mattituck Airport (21N)-** As already stated in the Potential Diversion Impacts section of this analysis, it is not likely that many aircraft would choose to divert their operations to Mattituck during the time period during which no airport will be available in East Hampton. Therefore, the potential impacts to ground transportation and roadways in the Mattituck airport area are expected to be negligible.

**Southampton Heliport (87N) –** As already stated in the Potential Diversion Impacts section of this analysis, the number of helicopters using the Airport has historically been negligible within the 3-day time period during which no airport will be available. On some days, there were zero helicopters using the Airport; on average, there has been approximately one (1) helicopter landing per day. The NYSDOT Traffic Viewer Data reports that Meadow Lane, the Southampton Village Street providing access to the Heliport, has an AADT of 1,015 vehicles per day (Station 071665, 566 feet east of Coopers Neck Lane year 2018). The road vehicles needed to accommodate the landing of one additional helicopter will have a negligible impact on the local road system in the Southampton Village area.

14. **Impact on Energy**

Closing the Airport and opening a New Airport will have no adverse impacts on energy. Opening a New Airport itself will not change any regulations or practices when compared to historical operations or practices at the Airport.

The proposed three (3) day period of time during which no airport is available is consistent with regular airport maintenance practices during which time airports are temporarily closed for maintenance work. Generally speaking, under the application of SEQRA regulations, regular or routine maintenance, not involving new programs or major reordering of priorities, is considered to have negligible or no environmental impacts and is exempt from SEQRA review as a Type II action.

Environmental Assessment Form Part 2 and Part 3                Airport Deactivation and Opening of
New Airport
Supplemental Information
January xx, 2022

Notwithstanding the above assessment, the 3-day period when an airport is not available is expected to reduce the amount of aircraft fuel purchased in East Hampton. Of the nearby airports, only Gabreski offers aircraft refueling. Thus, it may be anticipated that during the 3-day period, some additional fueling may occur at Gabreski. Compared to the size of operations at Gabreski, 63,602 operations in 2018, the potential change in fueling requirements to meet the demand from aircraft diverted is assessed as negligible.

### 15. Impact on Noise, Odor or Light

Closing the Airport and opening a New Airport will have no adverse impacts on noise, odor, or light. Opening the New Airport itself will not change any regulations, use or practices when compared to historical operations or practices at the Airport.

The proposed three (3) day period of time during which no airport is available is consistent with regular airport maintenance practices during which time airports are temporarily closed for maintenance work. Generally speaking, under the application of SEQRA regulations, regular or routine maintenance, not involving new programs or major reordering of priorities is considered to have negligible or no adverse environmental impacts and is exempt from SEQRA review as a Type II action.

Notwithstanding the above assessment, the 3-day period during which an airport is not available is expected to reduce the noise pollution and other negative impacts from aircraft noise on the community and along the flight paths separating New York City and East Hampton. Noise impacts to surrounding airports resulting from potential diversion of aircraft during this 3-day time period is anticipated to be minimal for the following reasons.

a. As discussed in the above response to potential impacts on Transportation, approximately 75 percent of all aircraft operations at the Airport historically occurred between May and September. February and March both experienced very low levels of activity. Further, Tuesday, Wednesday, and Thursday, historically experienced the lowest amount of aircraft operations in weekly cycle. Applying an average of historical data, the absence of an airport from March 1 to March 3 is estimated to affect approximately 32 aircraft landings and 32 departures. It can be estimated that approximately 47 percent of these aircraft activities will not divert to another airport as they are locally based aircraft. It can be anticipated that some additional aircraft operators will adjust their schedules and plan flights for the days before or after the temporary closure, and will not divert their operations to an alternative, nearby airport. But, using a worst-case scenario, the Transportation response to this the EAF assesses diversion impacts to each of the surrounding airports. No significant adverse impacts from diversion of aircraft have been identified. The potential noise impacts associated with potential diversion is considerably less than the seasonal difference in noise impacts associated with surrounding airports now.

Environmental Assessment Form Part 2 and Part 3                    Airport Deactivation and Opening of
New Airport
Supplemental Information
January xx, 2022

    b.   Further, noise complaints logged with the Town's noise hotline are overwhelmingly attributable to helicopters. During the contemplated 3-day period of time, very few if any helicopters have historically operated in or out the Airport.

    c.   Finally, the majority, or 66 percent of the aircraft that historically operated at the Airport during the contemplated 3-day period of time, are small piston-driven planes. The East Hampton public and the citizens from the surrounding communities have generally not complained about the noise or other concerns emanating from small piston-driven planes. The complaints are largely attributed to helicopters, jets, and seaplanes.

16. **Impact on Human Health**- No permanent physical changes, improvements, or alterations are proposed, and no permanent regulatory changes are proposed. Therefore, no impacts to human health will occur.

17. **Consistency with Community Plans-** Goal 2 of the Town Comprehensive Plan (2005) states the Town should "Take forceful measures to protect and restore the environment…" and reduce impacts on "noise." Impacts from noise emanating from the Airport have had a negative impact on the community. The subject proposal, to close the public use Airport and open a private use New Airport, will help the Town to obtain maximum control over the Airport and ultimately, after further study in the form of a Generic Environmental Impact Statement, devise controls to help meet the community concerns over unacceptable noise impacts. The proposal is consistent with the Town Comprehensive Plan.

18. **Consistency with Community Character**- The Town of East Hampton is defined by the unique character of its hamlets, villages, and countryside. With large expanses of pristine ocean beaches, scenic vistas, preserved farmland, historic landscapes, significant fish and wildlife habitats, and high-quality drinking water resources, the unique natural and cultural features of the Town are largely intact. Increased traffic at the Airport in recent years has created growing concerns about noise pollution, public health, safety, environmental and climate change impacts. These impacts are not well-aligned with East Hampton's identity as a resort community, and its commitment to sustaining the quality of life and the quiet enjoyment of its rich natural, cultural, and scenic resources. The proposed action is designed to help the Town gain better control over the Airport and shape it to better fit with the community character.

# D R A F T
## Town of East Hampton

Resolution Adopting
SEQRA Negative Declaration to Deactivate East Hampton Airport and Open New Private Use
Airport and Related FAA Required Actions

**WHEREAS,** the expiration of Federal Aviation Administration (FAA) grant assurances for the East Hampton Airport (the "Airport") on September 25, 2021 provides the opportunity for the Town Board of the Town of East Hampton (the "Town") to re-examine the future use and operation of the Airport, including by closing the Airport and opening a New Airport at which the Town can study the impact of operational restrictions designed to minimize and/or avoid longstanding noise, environmental, safety, and other impacts;

**WHEREAS,** in a November 6, 2020, letter, the FAA has suggested that the Town pursue one of the following options concerning the future use of the Airport: "(1) Negotiation of an agreement for mandatory restrictions on aircraft operators per Part 161; (2) Closure of the airport after the grant assurances expires and the reopening of the airport as a private use airport; (3) Complete closure of the airport after the grant assurances expires (September 2021); or (4) Continue to operate the airport as a public use airport";

**WHEREAS,** since receiving that November 2020 letter from the FAA, the Town has on several occasions discussed the future of the Airport with the FAA, including with members of the FAA's Office of Regional Administrator, Office of Airport Planning and Programming, Air Traffic Organization, Office of Airports (headquarters and regional), Office of the Chief Counsel, Flight Standards District Office, and the Office of Airport Compliance and Management Analysis, to ensure the Town works in collaboration with the FAA and consistent with the processes outlined in the November 2020 letter and applicable law;

**WHEREAS,** in the course of these discussions, the FAA and Town identified a fifth option concerning the Airport's continued operation which includes transitioning the Airport from public use to private use without closing the Airport per 14 C.F.R. Part 157;

**WHEREAS,** after receiving the FAA's suggested paths forward and in reliance on the November 2020 letter, in 2021 the Town undertook a year-long Airport re-examination public engagement project (the "Project") with the goals of gathering and disseminating information to the public so that there would be a shared and accepted understanding of the essential facts related to the conditions at the Airport; facilitating discussion and consensus building on future plans for the Airport; soliciting and compiling public input on key issues surrounding the Airport and preference for the future; and developing alternatives for the future to assist the Town Board decision-making;

1

**WHEREAS,** as part of the Project, the Town conducted eight public work session meetings with presentations by professional consultants and four public community engagement sessions involving over 300 participants. It also established a dedicated email address for written public comments and a Town weblink for access to all documents and presentations related to the Project (https://ehamptonny.gov/748/Documents-and-Presentations) where 617 written comments were received;

**WHEREAS,** the reports commissioned by the Town Board included: Overview and description of future alternatives by William O'Connor, Cooley LLP, May 11, 2021; Analysis of operations and noise complaint data by HMMH Consultants, May 11, 2021, "HMMH Review of Operations and Complaints; HMMH HTO Shoulder 2019 2020 Results"; Analysis of Jet Traffic by HMMH Consultants, May 13, 2021, "Addendum 2020 Summer Jet Traffic"; Evaluation of economic impacts by HRA Consultants, May 11, 2021, "HTO Economic Impact Analysis Summary Presentation 5.11.21" "HTO Economic Impact Analysis Full Presentation 5.11.21"; Update on PFC sampling and remediation by Nick Rigano, May 11, 2021; Update on Airport Operating Procedures by William O'Connor, July 6, 2021, "Operating Procedures Memo"; Carbon and Air Quality Emissions Assessment by Dr. Don Wuebbles, July 6, 2021, "Air Quality Presentation Dr. Don J. Wuebbles," "Air Quality Report Dr. Don J. Wuebbles"; Airport Environmental Conditions, Planning and Zoning Considerations By Lisa Liquori and Peter Flinker, August 3, 2021, "East Hampton Airport Draft Environmental Conditions, Planning & Zoning"; Draft Public Engagement Plan By Lisa Liquori, Fine Arts & Sciences and Peter Flinker, Dodson & Flinker, August 17, 2021; Airport Diversion Study HMMH Report September 6th, 2021 - Feasibility Study for the Diversion of Aircraft Operations at East Hampton Airport; HTO Legal Update Post Grant Assurances presentation by William O'Connor, Cooley LLP, October 19, 2021; Draft Public Engagement Process Summary 10.12.2021 By Fine Arts & Sciences, Dodson & Flinker; Review of the Draft Public Engagement Report By Lisa Liquori and Peter Flinker, December 21, 2021; and East Hampton Town Study of Airport Passengers by ARA - August 2021;

**WHEREAS,** members of the public provided the Town with additional studies responsive to the Town's consultant reports, including, GEI Data Air Quality Analysis Report, August 25, 2021; Review of Report Titled "Carbon and Air Quality Emissions for East Hampton NY and Its Airport"; Contribution of the East Hampton Airport to the East Hampton/Southampton Economy prepared by EBP US, December 14, 2020; and East Hampton Airport Diversion Study prepared by Garvett & Associates LLC, September 14, 2021; all of which have been reviewed and considered by members of the Town Board;

**WHEREAS,** the Town believes that the community is best served by obtaining maximum local control over the Airport such that the Town will have the utmost flexibility to address community concerns moving forward;

**WHEREAS**, from among the options suggested by the FAA as available to the Town, the Town believes, based on thorough review of public comment and consultant reports, that closing (or "deactivating") the Airport and opening it as a new private use facility ("New Airport")—Option 2 suggested by the FAA—achieves the Town's goals of obtaining maximum local control, retaining flexibility to control

aeronautical activities in East Hampton in the future, and protecting the community in the most comprehensive and effective manner, while also preserving a continuation of aviation services;

**WHEREAS**, the Option 2 approach allows the Town to have maximum flexibility at the New Airport because, among other reasons including those set forth in the November 2020 letter sent to the Town from the FAA, this process allows the Town to "use the remaining funds in the airport account as it desires" because all "remaining FAA obligations, such as Exclusive Rights, Revenue Use, Civil Rights, are extinguished upon closure";

**WHEREAS**, once the New Airport is operating, the Town will utilize a "prior permission required" framework, as suggested in the November 2020 letter from the FAA, that enables the Town to consider restrictions and limitations at the New Airport based on *inter alia* time of day, type of aircraft, type of operation, noise impacts, and/or environmental impacts; this prior permission required framework would be subject to adjustment by the Town as needed to ensure that the community's needs are being met and that advances in aviation technology, if any, are appropriately considered by future Town Boards and that such Town Boards have the flexibility needed to continue striking the right balance between the community and aviation stakeholders. The SEQRA GEIS process outlined below will help inform the Town how best to implement these decisions in the future;

**WHEREAS**, based on thorough review of public comment and consultant reports, the Town believes that the first option suggested by the FAA in the November 2020 letter was not desirable because, among other reasons, the Town is not a Part 139 airport and thus it does not receive regularly scheduled operators, meaning that identifying all operators who use the Airport is not feasible; moreover, even if a voluntary agreement could be reached with currently known operators, it would be ineffective against any new commercial operator entrants at the Airport as explained in the November 2020 FAA letter; and seeking voluntary agreements does not achieve the Town's goal of obtaining maximum local control and utmost flexibility moving forward;

**WHEREAS**, based on thorough review of public comment and consultant reports, the Town believes that the third option suggested by the FAA in the November 2020 letter is, at this time, unnecessary because public comments and professional studies suggest that a balance can be struck between aviation stakeholders and the community such that implementing restrictions or other limitations on operations can address much of the community's concern without foreclosing the ability of certain operators to continue operating out of the New Airport;

**WHEREAS**, based on thorough review of public comment and consultant reports, the Town believes that the fourth option suggested by the FAA in the November 2020 letter is not reflective of the community's interests regarding the Airport and that change at the Airport is necessary to respond to the community's valid concerns regarding noise, the environment, safety, and other issues;

3

**WHEREAS**, based on thorough review of public comment and consultant reports, the Town believes that the subsequently identified fifth option suggested by the FAA in discussions following receipt of the November 2020 letter is not suitable as it does not achieve the Town's goal of obtaining maximum local control and utmost flexibility moving forward at the New Airport, namely, because it would require the Town to remain subject to certain federal oversight that is not present under the Option 2 approach that the Town believes is preferable;

**WHEREAS**, to effectuate this change in status under applicable FAA rules, and based on continuing discussions with FAA representatives, the Town has determined that it is in the public interest to temporarily close (or "deactivate") the Airport for a period of three days at the beginning of March 2022 (March 1, 2, and 3) and then open a New Airport as a private use airport, thereby giving the Town the maximum flexibility possible in determining how to proceed with future airport operations. Such temporary closure and opening of a New Airport does not commit the Town to any specific future operational change that may impact the environment;

**WHEREAS**, the timing considerations regarding the closure of the Airport and opening of the New Airport were discussed with the FAA and the FAA confirmed that such timing was within the discretion of the Town Board;

**WHEREAS**, the Town's judgment to close the Airport for three days in early March (March 1, 2, and 3) before opening a New Airport will ensure all remaining federal statutory obligations are "extinguished," but also ensures that aviation would be disrupted as little as possible given that historical operations during this off-season Tuesday – Thursday time period show an average of 22 operations per day, 66 % of which are small, piston-driven aircraft;

**WHEREAS**, the Town Board chose this time period and duration for closure, after reviewing historical flight data and in part, to ensure that any flight operations to the East End of Long Island would not cause a significant adverse environmental impact to other airports or communities in the East End due to the low likelihood of a material amount of flight diversions;

**WHEREAS,** the New York State Environmental Quality Review Act (ECL Article 8 and its implementing regulations in 6 NYCRR Part 617) (collectively, "SEQRA") is applicable to discretionary decisions of a local agency such as the Town Board unless exempted by the SEQRA regulations. After exercising due diligence, the East Hampton Town Board determined it is the only State or local agency with a discretionary decision concerning the long term operation of the Airport and thus, is the SEQRA lead agency. The FAA as a federal agency, is not subject to SEQRA. When an agency has before it a complex set of decisions affecting management of public resources some of which may pose the potential for one or more significant adverse environmental effects, SEQRA offers the option of the use of a Generic Environmental Impact Statement to evaluate the potential environmental effects of alternative management options. Based on the numerous Airport related studies undertaken by the Town to date and the extensive public comments the Town Board has received from a wide spectrum of interested residents

4

and business interests, the Town Board believes the preparation and review of a Generic Environmental Impact Statement ("GEIS") is warranted. The SEQRA process envisions several steps in development and public review of a GEIS: (1) the preparation of a Draft Scoping Outline for the Draft GEIS and public review and comment thereon leading to a Final Scoping Outline; (2) preparation of the Draft GEIS itself, including all needed studies identified in the Final Scope; (3) public review and comment on the published Draft GEIS; (4) the preparation of a Final GEIS responding to public comments received on the Draft GEIS and containing any revisions determined necessary by the Town Board; and (5) adoption of a SEQRA Findings Statement considering the Final GEIS prior to adopting any changes to long term Airport operations;

**WHEREAS,** in contemplation of the preparation of a DGEIS, the Town Board has directed its consultants to prepare a Full EAF, SEQRA Positive Declaration and Draft Scoping Outline related to the consideration of long term operational changes at the New Airport that is reflective of the concerns in the extensive public comments received to date. The Draft Scoping outline will be the subject of public meetings and public comment period to be scheduled by the Town Board on or about February, 2022. The Draft Scoping outline will identify the Town Board's preliminary thoughts on alternatives and the studies and investigations it believes will be necessary to fully evaluate potential changes in operation to reduce or eliminate direct significant environmental impacts from operation of the New Airport and any indirect significant consequential environmental impacts that may occur elsewhere. These include: continuation of the same operations that were permissible at the Airport (no action under SEQRA), limitations on aircraft type, operation type, or hours to avoid or mitigate noise, environmental, safety, or other impacts, to closure of the New Airport and repurposing of the airport lands for non-aeronautical use;

**WHEREAS,** while a decision to close the public use Airport and open a private use New Airport under FAA rules is a discretionary action of the Town and therefore requires consideration of potential impacts under SEQRA, it does not commit the Town to a future course of actions that will affect the environment, but instead provides greater autonomy for the Town's operational authority. The Town Board will utilize the Final Generic Environmental Impact Statement and SEQRA Findings Statement to guide its decisions on final future operational changes at the New Airport. The Town Board believes that opening a private use New Airport will not in and of itself have any significant adverse environmental effects and can be permissibly segmented from the consideration of any long-term operational changes which will be evaluated in the DGEIS as set forth in 6 NYCRR §617.3(g)(1). A Full Environmental Assessment Form and Negative Declaration have been prepared that carefully consider whether closing the Airport and opening a New Airport as outlined in the FAA's November 2020 letter would potentially have a significant adverse impact on the environment (see Appendix A to this Resolution). Coupled with the prospective adoption of a Positive Declaration to examine the environmental, economic and social effects of potential changes to future operation of the New Airport, such permissible segmentation under SEQRA is no less protective of the environment.

**NOW, THEREFORE, BE IT RESOLVED,** that the Town Board declares itself the SEQRA lead agency for review of any changes to the status of the Airport and any future changes in operations at the New Airport; and be it

5

**FURTHER RESOLVED,** that the Town Board, after careful review and consideration, hereby adopts the attached SEQRA Negative Declaration (Appendix A) in relation to following FAA procedures for pursuing Option 2 set forth in the FAA's November 2020 letter, and be it

**FURTHER RESOLVED,** that in respect to the long term operation of the New Airport, the Town's Airport consultants are directed to prepare a Full EAF, Positive Declaration and Draft Scoping Outline for review and approval by the Town Board and scheduling of a public comment period and public meeting thereon in or about February, 2022; and be it,

**FURTHER RESOLVED,** that the Town will file the appropriate Form 7480-1 with the FAA to initiate the deactivation of the Airport and opening of a private use New Airport and work in conjunction with the FAA to complete the status change; and be it,

**FURTHER RESOLVED,** that the Town Attorney and the Town's Airport consultants assist the Town Clerk in drafting, publishing and circulating required SEQRA and other notices as applicable.

*Full Environmental Assessment Form*
*Part 1 - Project and Setting*

## Instructions for Completing Part 1

**Part 1 is to be completed by the applicant or project sponsor.**  Responses become part of the application for approval or funding, are subject to public review, and may be subject to further verification.

Complete Part 1 based on information currently available.  If additional research or investigation would be needed to fully respond to any item, please answer as thoroughly as possible based on current information; indicate whether missing information does not exist, or is not reasonably available to the sponsor; and, when possible, generally describe work or studies which would be necessary to update or fully develop that information.

Applicants/sponsors must complete all items in Sections A & B.  In Sections C, D & E, most items contain an initial question that must be answered either "Yes" or "No".  If the answer to the initial question is "Yes", complete the sub-questions that follow.  If the answer to the initial question is "No", proceed to the next question.  Section F allows the project sponsor to identify and attach any additional information.  Section G requires the name and signature of the applicant or project sponsor to verify that the information contained in Part 1is accurate and complete.

### A. Project and Applicant/Sponsor Information.

| Name of Action or Project: | | |
|---|---|---|
| Deactivate East Hampton Airport and Open New Private Use Airport and Related FAA Required Actions | | |
| Project Location (describe, and attach a general location map): | | |
| East Hampton Town Airport, Daniel's Hole Road, Wainscott Hamlet, East Hampton Town | | |
| Brief Description of Proposed Action (include purpose or need): <br><br> See attached description of Proposed Action in the Environmental Assessment Form Part 2 and Part 3 Supplemental Information | | |
| Name of Applicant/Sponsor: <br> East Hampton Town Board | Telephone: 631-324-4140 | |
| | E-Mail: PVanScoyoc@ehamptonny.gov | |
| Address: 159 Pantigo Road | | |
| City/PO: East Hampton | State: New York | Zip Code: 11937 |
| Project Contact (if not same as sponsor; give name and title/role): <br> Peter Van Scoyoc, Town Supervisor | Telephone: same | |
| | E-Mail: same | |
| Address: <br> same | | |
| City/PO: <br> same | State: <br> same | Zip Code: <br> same |
| Property Owner  (if not same as sponsor): <br> East Hampton Town | Telephone: same | |
| | E-Mail: same | |
| Address: <br> same | | |
| City/PO:  same | State: same | Zip Code: same |

FEAF 2019

**B. Government Approvals**

| B. Government Approvals, Funding, or Sponsorship. ("Funding" includes grants, loans, tax relief, and any other forms of financial assistance.) | | |
|---|---|---|
| **Government Entity** | **If Yes: Identify Agency and Approval(s) Required** | **Application Date (Actual or projected)** |
| a. City Counsel, Town Board, ☑Yes☐No or Village Board of Trustees | Town Board | |
| b. City, Town or Village ☐Yes☑No Planning Board or Commission | | |
| c. City, Town or ☐Yes☑No Village Zoning Board of Appeals | | |
| d. Other local agencies ☐Yes☑No | | |
| e. County agencies ☐Yes☑No | | |
| f. Regional agencies ☐Yes☑No | | |
| g. State agencies ☐Yes☑No | | |
| h. Federal agencies ☐Yes☑No | | |

i. Coastal Resources.

   *i.* Is the project site within a Coastal Area, or the waterfront area of a Designated Inland Waterway? ☐Yes☑No

   *ii.* Is the project site located in a community with an approved Local Waterfront Revitalization Program? ☑Yes☐No

   *iii.* Is the project site within a Coastal Erosion Hazard Area? ☐Yes☑No

**C. Planning and Zoning**

| C.1. Planning and zoning actions. |
|---|
| Will administrative or legislative adoption, or amendment of a plan, local law, ordinance, rule or regulation be the only approval(s) which must be granted to enable the proposed action to proceed? ☑Yes☐No<br>• **If Yes,** complete sections C, F and G.<br>• **If No,** proceed to question C.2 and complete all remaining sections and questions in Part 1 |

| C.2. Adopted land use plans. |
|---|
| a. Do any municipally- adopted (city, town, village or county) comprehensive land use plan(s) include the site where the proposed action would be located? ☑Yes☐No<br>If Yes, does the comprehensive plan include specific recommendations for the site where the proposed action would be located? ☑Yes☐No |
| b. Is the site of the proposed action within any local or regional special planning district (for example: Greenway; Brownfield Opportunity Area (BOA); designated State or Federal heritage area; watershed management plan; or other?) ☑Yes☐No<br>If Yes, identify the plan(s):<br>East Hampton Airport Master Plan; NYS Special Groundwater Protection Area (SGPA); Suffolk County Pine Barrens; East Hampton Town Water Recharge Overlay District Area; East Hampton Town Priority Drinking Water Protection Area; Superfund Remediation Sites 152156 |
| c. Is the proposed action located wholly or partially within an area listed in an adopted municipal open space plan, or an adopted municipal farmland protection plan? ☑Yes☐No<br>If Yes, identify the plan(s):<br>East Hampton Community Preservation Fund Project Plan |

**C.3.  Zoning**

| | |
|---|---|
| a.  Is the site of the proposed action located in a municipality with an adopted zoning law or ordinance. | ☑Yes☐No |

If Yes, what is the zoning classification(s) including any applicable overlay district?
Commercial Industrial (CI); Commercial Industrial Water Recharge Overlay District (CI WRO); Parks and Conservation (PC)

_____

| | |
|---|---|
| b.  Is the use permitted or allowed by a special or conditional use permit? | ☑Yes☐No |

| | |
|---|---|
| c. Is a zoning change requested as part of the proposed action? | ☐Yes☑No |

If Yes,
  *i.* What is the proposed new zoning for the site?  _____

**C.4. Existing community services.**

a. In what school district is the project site located?   Wainscott
_____

b. What police or other public protection forces serve the project site?
East Hampton Town Police Department
_____

c. Which fire protection and emergency medical services serve the project site?
Northwest Fire Protection District
_____

d. What parks serve the project site?
East Hampton Town contains Town, County and State parks.
_____

**D.  Project Details**     N.A.

**D.1. Proposed and Potential Development**

a. What is the general nature of the proposed action (e.g., residential, industrial, commercial, recreational; if mixed, include all components)?
_____

b. a. Total acreage of the site of the proposed action?  _____ acres
  b. Total acreage to be physically disturbed?  _____ acres
  c. Total acreage (project site and any contiguous properties) owned or controlled by the applicant or project sponsor?  _____ acres

c. Is the proposed action an expansion of an existing project or use?  ☐Yes☐No
  *i.* If Yes, what is the approximate percentage of the proposed expansion and identify the units (e.g., acres, miles, housing units, square feet)?   % _____   Units: _____

d. Is the proposed action a subdivision, or does it include a subdivision?  ☐Yes☐No
If Yes,
  *i.* Purpose or type of subdivision? (e.g., residential, industrial, commercial; if mixed, specify types)
_____
  *ii.* Is a cluster/conservation layout proposed?  ☐Yes☐No
  *iii.* Number of lots proposed? _____
  *iv.* Minimum and maximum proposed lot sizes?  Minimum _____  Maximum _____

e. Will the proposed action be constructed in multiple phases?  ☐Yes☐No
  *i.* If No, anticipated period of construction:  _____ months
  *ii.* If Yes:
- Total number of phases anticipated  _____
- Anticipated commencement date of phase 1 (including demolition)  _____ month _____ year
- Anticipated completion date of final phase  _____ month _____ year
- Generally describe connections or relationships among phases, including any contingencies where progress of one phase may determine timing or duration of future phases: _____
_____

f. Does the project include new residential uses?  ☐Yes☐No
If Yes, show numbers of units proposed.

|  | One Family | Two Family | Three Family | Multiple Family (four or more) |
|---|---|---|---|---|
| Initial Phase | _____ | _____ | _____ | _____ |
| At completion of all phases | _____ | _____ | _____ | _____ |

g. Does the proposed action include new non-residential construction (including expansions)?  ☐Yes☐No
If Yes,
   *i.* Total number of structures _____
   *ii.* Dimensions (in feet) of largest proposed structure: _____height; _____width; and _____ length
   *iii.* Approximate extent of building space to be heated or cooled: _____ square feet

h. Does the proposed action include construction or other activities that will result in the impoundment of any   ☐Yes☐No
   liquids, such as creation of a water supply, reservoir, pond, lake, waste lagoon or other storage?
If Yes,
   *i.* Purpose of the impoundment: _____
   *ii.* If a water impoundment, the principal source of the water:   ☐ Ground water ☐Surface water streams ☐Other specify:
   _____
   *iii.* If other than water, identify the type of impounded/contained liquids and their source.
   _____

   *iv.* Approximate size of the proposed impoundment.   Volume: _____ million gallons; surface area: _____ acres
   *v.* Dimensions of the proposed dam or impounding structure:   _____ height; _____ length
   *vi.* Construction method/materials  for the proposed dam or impounding structure (e.g., earth fill, rock, wood, concrete):
   _____

## D.2.  Project Operations

a. Does the proposed action include any excavation, mining, or dredging, during construction, operations, or both?   ☐Yes☐No
   (Not including general site preparation, grading or installation of utilities or foundations where all excavated
   materials will remain onsite)
If Yes:
   *i* .What is the purpose of the excavation or dredging? _____
   *ii.* How much material (including rock, earth, sediments, etc.) is proposed to be removed from the site?
      •  Volume (specify tons or cubic yards): _____
      •  Over what duration of time? _____
   *iii.* Describe nature and characteristics of materials to be excavated or dredged, and plans to use, manage or dispose of them.
      _____

   *iv.* Will there be onsite dewatering or processing of excavated materials?   ☐Yes☐No
      If yes, describe. _____
      _____

   *v.* What is the total area to be dredged or excavated? _____acres
   *vi.* What is the maximum area to be worked at any one time? _____acres
   *vii.* What would be the maximum depth of excavation or dredging? _____feet
   *viii.* Will the excavation require blasting? _____   ☐Yes☐No
   *ix.* Summarize site reclamation goals and plan: _____
      _____
      _____
      _____

b. Would the proposed action cause or result in alteration of, increase or decrease in size of, or encroachment   ☐Yes☐No
   into any existing wetland, waterbody, shoreline, beach or adjacent area?
If Yes:
   *i.* Identify the wetland or waterbody which would be affected (by name, water index number, wetland map number or geographic
      description): _____
      _____

*ii.* Describe how the  proposed action would affect that waterbody or wetland, e.g. excavation, fill, placement of structures, or alteration of channels, banks and shorelines.  Indicate extent of activities, alterations and additions in square feet or acres:

_____
_____
_____
_____

---

*iii.* Will the proposed action cause or result in disturbance to bottom sediments?  ☐Yes☐No
    If Yes, describe: _____

*iv.* Will the proposed action cause or result in the destruction or removal of aquatic vegetation?  ☐Yes☐No
    If Yes:
- acres of aquatic vegetation proposed to be removed:  _____
- expected acreage of aquatic vegetation remaining after project completion:_____
- purpose of proposed removal (e.g. beach clearing, invasive species control, boat access): _____
_____
- proposed method of plant removal: _____
- if chemical/herbicide treatment will be used, specify product(s): _____

*v.* Describe any proposed reclamation/mitigation following disturbance: _____
_____

---

c. Will the proposed action use, or create a new demand for water?  ☐Yes☐No
If Yes:
    *i.* Total anticipated water usage/demand per day: _____ gallons/day
*ii.* Will the proposed action obtain water from an existing public water supply?  ☐Yes☐No
If Yes:
- Name of district or service area:  _____
- Does the existing public water supply have capacity to serve the proposal?  ☐Yes☐ No
- Is the project site in the existing district?  ☐Yes☐ No
- Is expansion of the district needed?  ☐Yes☐ No
- Do existing lines serve the project site?  ☐Yes☐ No

*iii.* Will line extension within an existing district be necessary to supply the project?  ☐Yes☐No
If Yes:
- Describe extensions or capacity expansions proposed to serve this project: _____
_____
- Source(s) of supply for the district: _____

*iv.* Is a new water supply district or service area proposed to be formed to serve the project site?  ☐ Yes☐No
If, Yes:
- Applicant/sponsor for new district: _____
- Date application submitted or anticipated: _____
- Proposed source(s) of supply for new district: _____
*v.* If a public water supply will not be used, describe plans to provide water supply for the project: _____
_____

*vi.* If water supply will be from wells (public or private), what is the maximum pumping capacity: _____ gallons/minute.

---

d. Will the proposed action generate liquid wastes?  ☐Yes☐No
If Yes:
    *i.* Total anticipated liquid waste generation per day: _____ gallons/day
*ii.* Nature of liquid wastes to be generated (e.g., sanitary wastewater, industrial; if combination, describe all components and approximate volumes or proportions of each): _____
_____
_____

*iii.* Will the proposed action use any existing public wastewater treatment facilities?  ☐Yes☐No
    If Yes:
- Name of wastewater treatment plant to be used: _____
- Name of district: _____
- Does the existing wastewater treatment plant have capacity to serve the project?  ☐Yes☐No
- Is the project site in the existing district?  ☐Yes☐No
- Is expansion of the district needed?  ☐Yes☐No

- Do existing sewer lines serve the project site? ☐Yes☐No
- Will a line extension within an existing district be necessary to serve the project? ☐Yes☐No
  If Yes:
  - Describe extensions or capacity expansions proposed to serve this project: _____
  _____

*iv.* Will a new wastewater (sewage) treatment district be formed to serve the project site? ☐Yes☐No
  If Yes:
  - Applicant/sponsor for new district: _____
  - Date application submitted or anticipated: _____
  - What is the receiving water for the wastewater discharge? _____

*v.* If public facilities will not be used, describe plans to provide wastewater treatment for the project, including specifying proposed receiving water (name and classification if surface discharge or describe subsurface disposal plans):
  _____
  _____

*vi.* Describe any plans or designs to capture, recycle or reuse liquid waste: _____
  _____
  _____

---

e. Will the proposed action disturb more than one acre and create stormwater runoff, either from new point sources (i.e. ditches, pipes, swales, curbs, gutters or other concentrated flows of stormwater) or non-point source (i.e. sheet flow) during construction or post construction? ☐Yes☐No
  If Yes:
  *i.* How much impervious surface will the project create in relation to total size of project parcel?
    _____ Square feet or _____ acres (impervious surface)
    _____ Square feet or _____ acres (parcel size)
  *ii.* Describe types of new point sources. _____
  _____
  *iii.* Where will the stormwater runoff be directed (i.e. on-site stormwater management facility/structures, adjacent properties, groundwater, on-site surface water or off-site surface waters)?
  _____
  _____
  - If to surface waters, identify receiving water bodies or wetlands: _____
  _____
  - Will stormwater runoff flow to adjacent properties? ☐Yes☐No
  *iv.* Does the proposed plan minimize impervious surfaces, use pervious materials or collect and re-use stormwater? ☐Yes☐No

---

f. Does the proposed action include, or will it use on-site, one or more sources of air emissions, including fuel combustion, waste incineration, or other processes or operations? ☐Yes☐No
  If Yes, identify:
  *i.* Mobile sources during project operations (e.g., heavy equipment, fleet or delivery vehicles)
  _____
  *ii.* Stationary sources during construction (e.g., power generation, structural heating, batch plant, crushers)
  _____
  *iii.* Stationary sources during operations (e.g., process emissions, large boilers, electric generation)
  _____

---

g. Will any air emission sources named in D.2.f (above), require a NY State Air Registration, Air Facility Permit, or Federal Clean Air Act Title IV or Title V Permit? ☐Yes☐No
  If Yes:
  *i.* Is the project site located in an Air quality non-attainment area? (Area routinely or periodically fails to meet ambient air quality standards for all or some parts of the year) ☐Yes☐No
  *ii.* In addition to emissions as calculated in the application, the project will generate:
  - _____Tons/year (short tons) of Carbon Dioxide ($CO_2$)
  - _____Tons/year (short tons) of Nitrous Oxide ($N_2O$)
  - _____Tons/year (short tons) of Perfluorocarbons (PFCs)
  - _____Tons/year (short tons) of Sulfur Hexafluoride ($SF_6$)
  - _____Tons/year (short tons) of Carbon Dioxide equivalent of Hydroflourocarbons (HFCs)
  - _____Tons/year (short tons) of Hazardous Air Pollutants (HAPs)

Page 6 of 13

h. Will the proposed action generate or emit methane (including, but not limited to, sewage treatment plants, landfills, composting facilities)? □Yes□No

If Yes:

*i.* Estimate methane generation in tons/year (metric): _____

*ii.* Describe any methane capture, control or elimination measures included in project design (e.g., combustion to generate heat or electricity, flaring): _____

_____

---

i. Will the proposed action result in the release of air pollutants from open-air operations or processes, such as quarry or landfill operations? □Yes□No

If Yes: Describe operations and nature of emissions (e.g., diesel exhaust, rock particulates/dust):

_____

_____

---

j. Will the proposed action result in a substantial increase in traffic above present levels or generate substantial new demand for transportation facilities or services? □Yes□No

If Yes:

*i.* When is the peak traffic expected (Check all that apply):   □ Morning     □ Evening     □Weekend

□ Randomly between hours of _____ to _____.

*ii.* For commercial activities only, projected number of truck trips/day and type (e.g., semi trailers and dump trucks): _____

_____

*iii.* Parking spaces:     Existing _____     Proposed _____     Net increase/decrease _____

*iv.* Does the proposed action include any shared use parking? □Yes□No

*v.* If the proposed action includes any modification of existing roads, creation of new roads or change in existing access, describe:

_____

*vi.* Are public/private transportation service(s) or facilities available within ½ mile of the proposed site? □Yes□No

*vii* Will the proposed action include access to public transportation or accommodations for use of hybrid, electric or other alternative fueled vehicles? □Yes□No

*viii.* Will the proposed action include plans for pedestrian or bicycle accommodations for connections to existing pedestrian or bicycle routes? □Yes□No

---

k. Will the proposed action (for commercial or industrial projects only) generate new or additional demand for energy? □Yes□No

If Yes:

*i.* Estimate annual electricity demand during operation of the proposed action: _____

_____

*ii.* Anticipated sources/suppliers of electricity for the project (e.g., on-site combustion, on-site renewable, via grid/local utility, or other): 

_____

*iii.* Will the proposed action require a new, or an upgrade, to an existing substation? □Yes□No

---

l. Hours of operation.  Answer all items which apply.

*i.* During Construction:

- Monday - Friday: _____
- Saturday: _____
- Sunday: _____
- Holidays: _____

*ii.* During Operations:

- Monday - Friday: _____
- Saturday: _____
- Sunday: _____
- Holidays: _____

m. Will the proposed action produce noise that will exceed existing ambient noise levels during construction, operation, or both?  ☐Yes ☐No

If yes:

*i.* Provide details including sources, time of day and duration:

_____
_____

*ii.* Will the proposed action remove existing natural barriers that could act as a noise barrier or screen?  ☐Yes ☐No

Describe: _____
_____

n. Will the proposed action have outdoor lighting?  ☐Yes ☐No

If yes:

*i.* Describe source(s), location(s), height of fixture(s), direction/aim, and proximity to nearest occupied structures:

_____

*ii.* Will proposed action remove existing natural barriers that could act as a light barrier or screen?  ☐Yes ☐No

Describe: _____
_____

o. Does the proposed action have the potential to produce odors for more than one hour per day?  ☐Yes ☐No

If Yes, describe possible sources, potential frequency and duration of odor emissions, and proximity to nearest occupied structures: _____
_____
_____

p. Will the proposed action include any bulk storage of petroleum (combined capacity of over 1,100 gallons)  ☐Yes ☐No
or chemical products 185 gallons in above ground storage or any amount in underground storage?

If Yes:

*i.* Product(s) to be stored _____
*ii.* Volume(s) _____ per unit time _____ (e.g., month, year)
*iii.* Generally, describe the proposed storage facilities:_____
_____

q. Will the proposed action (commercial, industrial and recreational projects only) use pesticides (i.e., herbicides, insecticides) during construction or operation?  ☐ Yes ☐No

If Yes:

*i.* Describe proposed treatment(s):

_____
_____
_____
_____

*ii.* Will the proposed action use Integrated Pest Management Practices?  ☐ Yes ☐No

r. Will the proposed action (commercial or industrial projects only) involve or require the management or disposal  ☐ Yes ☐No
of solid waste (excluding hazardous materials)?

If Yes:

*i.* Describe any solid waste(s) to be generated during construction or operation of the facility:
- Construction: _____ tons per _____ (unit of time)
- Operation : _____ tons per _____ (unit of time)

*ii.* Describe any proposals for on-site minimization, recycling or reuse of materials to avoid disposal as solid waste:
- Construction: _____
_____
- Operation: _____
_____

*iii.* Proposed disposal methods/facilities for solid waste generated on-site:
- Construction: _____
_____
- Operation: _____
_____

Page 8 of 13

s. Does the proposed action include construction or modification of a solid waste management facility?   ☐ Yes ☐ No

If Yes:

    *i.* Type of management or handling of waste proposed for the site (e.g., recycling or transfer station, composting, landfill, or other disposal activities): _____

    *ii.* Anticipated rate of disposal/processing:

       • _____ Tons/month, if transfer or other non-combustion/thermal treatment, or

       • _____ Tons/hour, if combustion or thermal treatment

    *iii.* If landfill, anticipated site life: _____ years

---

t. Will the proposed action at the site involve the commercial generation, treatment, storage, or disposal of hazardous   ☐Yes☐No
waste?

If Yes:

    *i.* Name(s) of all hazardous wastes or constituents to be generated, handled or managed at facility: _____

_____

    *ii.* Generally describe processes or activities involving hazardous wastes or constituents: _____

_____

    *iii.* Specify amount to be handled or generated _____ tons/month

    *iv.* Describe any proposals for on-site minimization, recycling or reuse of hazardous constituents: _____

_____

    *v.* Will any hazardous wastes be disposed at an existing offsite hazardous waste facility?   ☐Yes☐No

If Yes: provide name and location of facility: _____

_____

If No: describe proposed management of any hazardous wastes which will not be sent to a hazardous waste facility:

_____

_____

## E. Site and Setting of Proposed Action   N.A.

---

### E.1. Land uses on and surrounding the project site

a. Existing land uses.

    *i.* Check all uses that occur on, adjoining and near the project site.

    ☐ Urban  ☐ Industrial  ☐ Commercial  ☐ Residential (suburban)  ☐ Rural (non-farm)

    ☐ Forest  ☐ Agriculture  ☐ Aquatic  ☐ Other (specify): _____

    *ii.* If mix of uses, generally describe:

_____

_____

b. Land uses and covertypes on the project site.

| Land use or Covertype | Current Acreage | Acreage After Project Completion | Change (Acres +/-) |
|---|---|---|---|
| • Roads, buildings, and other paved or impervious surfaces | | | |
| • Forested | | | |
| • Meadows, grasslands or brushlands (non-agricultural, including abandoned agricultural) | | | |
| • Agricultural (includes active orchards, field, greenhouse etc.) | | | |
| • Surface water features (lakes, ponds, streams, rivers, etc.) | | | |
| • Wetlands (freshwater or tidal) | | | |
| • Non-vegetated (bare rock, earth or fill) | | | |
| • Other Describe: _____ | | | |

c. Is the project site presently used by members of the community for public recreation? ☐Yes☐No
   *i.* If Yes: explain: _____

d. Are there any facilities serving children, the elderly, people with disabilities (e.g., schools, hospitals, licensed ☐Yes☐No
   day care centers, or group homes) within 1500 feet of the project site?
 If Yes,
   *i.* Identify Facilities:
     _____
     _____

e. Does the project site contain an existing dam? ☐Yes☐No
 If Yes:
   *i.* Dimensions of the dam and impoundment:
     • Dam height: _____ feet
     • Dam length: _____ feet
     • Surface area: _____ acres
     • Volume impounded: _____ gallons OR acre-feet
   *ii.* Dam's existing hazard classification: _____
   *iii.* Provide date and summarize results of last inspection:
     _____
     _____

f. Has the project site ever been used as a municipal, commercial or industrial solid waste management facility, ☐Yes☐No
   or does the project site adjoin property which is now, or was at one time, used as a solid waste management facility?
 If Yes:
   *i.* Has the facility been formally closed? ☐Yes☐ No
     • If yes, cite sources/documentation: _____
   *ii.* Describe the location of the project site relative to the boundaries of the solid waste management facility:
     _____
     _____
   *iii.* Describe any development constraints due to the prior solid waste activities: _____

g. Have hazardous wastes been generated, treated and/or disposed of at the site, or does the project site adjoin ☐Yes☐No
   property which is now or was at one time used to commercially treat, store and/or dispose of hazardous waste?
 If Yes:
   *i.* Describe waste(s) handled and waste management activities, including approximate time when activities occurred:
     _____
     _____

h. Potential contamination history. Has there been a reported spill at the proposed project site, or have any ☐Yes☐ No
   remedial actions been conducted at or adjacent to the proposed site?
 If Yes:
   *i.* Is any portion of the site listed on the NYSDEC Spills Incidents database or Environmental Site ☐Yes☐No
   Remediation database? Check all that apply:
   ☐ Yes – Spills Incidents database     Provide DEC ID number(s): _____
   ☐ Yes – Environmental Site Remediation database   Provide DEC ID number(s): _____
   ☐ Neither database
   *ii.* If site has been subject of RCRA corrective activities, describe control measures:_____
     _____

   *iii.* Is the project within 2000 feet of any site in the NYSDEC Environmental Site Remediation database? ☐Yes☐No
 If yes, provide DEC ID number(s): _____

   *iv.* If yes to (i), (ii) or (iii) above, describe current status of site(s):
     _____
     _____

*v.* Is the project site subject to an institutional control limiting property uses? ☐Yes☐No
- If yes, DEC site ID number: _____
- Describe the type of institutional control (e.g., deed restriction or easement): _____
- Describe any use limitations: _____
- Describe any engineering controls: _____
- Will the project affect the institutional or engineering controls in place? ☐Yes☐No
- Explain: _____
  _____
  _____

**E.2.  Natural Resources On or Near Project Site**

a. What is the average depth to bedrock on the project site? _____ feet

b. Are there bedrock outcroppings on the project site? ☐Yes☐No
If Yes, what proportion of the site is comprised of bedrock outcroppings? _____%

c. Predominant soil type(s) present on project site: _____  _____%
   _____  _____%
   _____  _____%

d. What is the average depth to the water table on the project site?  Average: _____ feet

e. Drainage status of project site soils:☐ Well Drained: _____% of site
   ☐ Moderately Well Drained: _____% of site
   ☐ Poorly Drained _____% of site

f. Approximate proportion of proposed action site with slopes: ☐ 0-10%: _____% of site
   ☐ 10-15%: _____% of site
   ☐ 15% or greater: _____% of site

g. Are there any unique geologic features on the project site? ☐Yes☐No
 If Yes, describe: _____
  _____

h. Surface water features.
 *i.* Does any portion of the project site contain wetlands or other waterbodies (including streams, rivers, ☐Yes☐No
   ponds or lakes)?
 *ii.* Do wetlands or other waterbodies adjoin the project site? ☐Yes☐No
 If Yes to either *i* or *ii*, continue.  If No, skip to E.2.i.
 *iii.*  Are any of the wetlands or waterbodies within or adjoining the project site regulated by any federal, ☐Yes☐No
   state or local agency?
 *iv.* For each identified regulated wetland and waterbody on the project site, provide the following information:
  - Streams:	Name _____  Classification _____
  - Lakes or Ponds:  Name _____  Classification _____
  - Wetlands:	Name _____  Approximate Size _____
  - Wetland No. (if regulated by DEC) _____
 *v.* Are any of the above water bodies listed in the most recent compilation of NYS water quality-impaired ☐Yes☐No
   waterbodies?
 If yes, name of impaired water body/bodies and basis for listing as impaired: _____
  _____

i. Is the project site in a designated Floodway? ☐Yes☐No

j. Is the project site in the 100-year Floodplain? ☐Yes☐No

k. Is the project site in the 500-year Floodplain? ☐Yes☐No

l. Is the project site located over, or immediately adjoining, a primary, principal or sole source aquifer? ☐Yes☐No
If Yes:
 *i.* Name of aquifer: _____

m. Identify the predominant wildlife species that occupy or use the project site:

_____    _____    _____
_____    _____    _____

---

n. Does the project site contain a designated significant natural community?          ☐Yes☐No
If Yes:
   *i.* Describe the habitat/community (composition, function, and basis for designation): _____
_____
   *ii.* Source(s) of description  or evaluation: _____
   *iii.* Extent of community/habitat:
- Currently: _____ acres
- Following completion of project as proposed: _____ acres
- Gain or loss (indicate + or -): _____ acres

---

o. Does project site contain any species of plant or animal that is listed by the federal government or NYS as          ☐Yes☐No
  endangered or threatened, or does it contain any areas identified as habitat for an endangered or threatened species?
If Yes:
   *i.* Species and listing (endangered or threatened):_____
_____
_____

---

p.  Does the project site contain any species of plant or animal that is listed by NYS as rare, or as a species of          ☐Yes☐No
  special concern?
If Yes:
   *i.* Species and listing:_____
_____

---

q. Is the project site or adjoining area currently used for hunting, trapping, fishing or shell fishing?          ☐Yes☐No
If yes, give a brief description of how the proposed action may affect that use: _____

---

**E.3.  Designated Public Resources On or Near Project Site**

a. Is the project site, or any portion of it, located in a designated agricultural district certified pursuant to          ☐Yes☐No
  Agriculture and  Markets Law, Article 25-AA, Section 303 and 304?
If Yes,  provide county plus district name/number: _____

---

b. Are agricultural lands consisting of highly productive soils present?          ☐Yes☐No
   *i.* If Yes: acreage(s) on project site? _____
   *ii.* Source(s) of soil rating(s): _____

---

c. Does the project site contain all or part of, or is it substantially contiguous to, a registered National          ☐Yes☐No
  Natural Landmark?
If Yes:
   *i.* Nature of the natural landmark:     ☐ Biological Community     ☐ Geological Feature
   *ii.* Provide brief description of landmark, including values behind designation and approximate size/extent: _____
_____
_____

---

d. Is the project site located in or does it adjoin a state listed Critical Environmental Area?          ☐Yes☐No
If Yes:
   *i.* CEA name: _____
   *ii.* Basis for designation: _____
   *iii.* Designating agency and date: _____

Page 12 of 13

e. Does the project site contain, or is it substantially contiguous to, a building, archaeological site, or district  ☐Yes☐No
   which is listed on the National or State Register of Historic Places, or that has been determined by the Commissioner of the NYS
   Office of Parks, Recreation and Historic Preservation to be eligible for listing on the State Register of Historic Places?
   If Yes:
      *i.* Nature of historic/archaeological resource:  ☐Archaeological Site      ☐Historic Building or District
      *ii.* Name: _____
   *iii.* Brief description of attributes on which listing is based:
      _____
      _____

f. Is the project site, or any portion of  it, located in or adjacent to an area designated as sensitive for  ☐Yes☐No
   archaeological sites on the NY State Historic Preservation Office (SHPO) archaeological site inventory?

g. Have additional archaeological or historic site(s) or resources been identified on the project site?  ☐Yes☐No
   If Yes:
      *i.* Describe possible resource(s): _____
      *ii.* Basis for identification:  _____

h. Is the project site within fives miles of any officially designated and publicly accessible federal, state, or local  ☐Yes☐No
   scenic or aesthetic resource?
   If Yes:
      *i.* Identify resource: _____
      *ii.* Nature of, or basis for, designation (e.g., established highway overlook, state or local park, state historic trail or scenic byway,
         etc.): _____
   *iii.* Distance between project and resource: _____ miles.

i.  Is the project site located within a designated river corridor under the Wild, Scenic and Recreational Rivers  ☐Yes☐No
   Program 6 NYCRR 666?
   If Yes:
      *i.* Identify the name of the river and its designation: _____
      *ii.* Is the activity consistent with development restrictions contained in 6NYCRR Part 666?  ☐Yes☐No

**F. Additional Information**
Attach any additional information which may be needed to clarify your project.
    See Attached Environmental Assessment Form Part 2 and Part 3 Supplemental Informationt
If you have identified any adverse impacts which could be associated with your proposal, please describe those impacts plus any
measures which you propose to avoid or minimize them.

**G.  Verification**
I certify that the information provided is true to the best of my knowledge.

Applicant/Sponsor Name Peter Van Scoyoc _____    Date_____

Signature_____    Title East Hampton Town Supervisor _____

PRINT FORM                              Page 13 of 13

*Full Environmental Assessment Form*
*Part 2 - Identification of Potential Project Impacts*

Agency Use Only [If applicable]

Project : Deactivate Airport / Open New Airport

Date : January , 2022

**Part 2 is to be completed by the lead agency.** Part 2 is designed to help the lead agency inventory all potential resources that could be affected by a proposed project or action. We recognize that the lead agency's reviewer(s) will not necessarily be environmental professionals. So, the questions are designed to walk a reviewer through the assessment process by providing a series of questions that can be answered using the information found in Part 1. To further assist the lead agency in completing Part 2, the form identifies the most relevant questions in Part 1 that will provide the information needed to answer the Part 2 question. When Part 2 is completed, the lead agency will have identified the relevant environmental areas that may be impacted by the proposed activity.

If the lead agency is a state agency **and** the action is in any Coastal Area, complete the Coastal Assessment Form before proceeding with this assessment.

**Tips for completing Part 2:**

- Review all of the information provided in Part 1.
- Review any application, maps, supporting materials and the Full EAF Workbook.
- Answer each of the 18 questions in Part 2.
- If you answer "**Yes**" to a numbered question, please complete all the questions that follow in that section.
- If you answer "**No**" to a numbered question, move on to the next numbered question.
- Check appropriate column to indicate the anticipated size of the impact.
- Proposed projects that would exceed a numeric threshold contained in a question should result in the reviewing agency checking the box "Moderate to large impact may occur."
- The reviewer is not expected to be an expert in environmental analysis.
- If you are not sure or undecided about the size of an impact, it may help to review the sub-questions for the general question and consult the workbook.
- When answering a question consider all components of the proposed activity, that is, the "whole action".
- Consider the possibility for long-term and cumulative impacts as well as direct impacts.
- Answer the question in a reasonable manner considering the scale and context of the project.

**1. Impact on Land**
  Proposed action may involve construction on, or physical alteration of,      ☑ NO      ☐ YES
  the land surface of the proposed site. (See Part 1. D.1)
  *If "Yes", answer questions a - j. If "No", move on to Section 2.*

| | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. The proposed action may involve construction on land where depth to water table is less than 3 feet. | E2d | ☐ | ☐ |
| b. The proposed action may involve construction on slopes of 15% or greater. | E2f | ☐ | ☐ |
| c. The proposed action may involve construction on land where bedrock is exposed, or generally within 5 feet of existing ground surface. | E2a | ☐ | ☐ |
| d. The proposed action may involve the excavation and removal of more than 1,000 tons of natural material. | D2a | ☐ | ☐ |
| e. The proposed action may involve construction that continues for more than one year or in multiple phases. | D1e | ☐ | ☐ |
| f. The proposed action may result in increased erosion, whether from physical disturbance or vegetation removal (including from treatment by herbicides). | D2e, D2q | ☐ | ☐ |
| g. The proposed action is, or may be, located within a Coastal Erosion hazard area. | B1i | ☐ | ☐ |
| h. Other impacts: _____ _____ | | ☐ | ☐ |

Page **1** of 10

**2.  Impact on Geological Features**

The proposed action may result in the modification or destruction of, or inhibit access to, any unique or unusual land forms on the site (e.g., cliffs, dunes, minerals, fossils, caves).  (See Part 1. E.2.g)        ☒ NO        ☐ YES

*If "Yes", answer questions a - c.  If "No", move on to Section 3.*

|  | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. Identify the specific land form(s) attached: _____ _____ | E2g | ☐ | ☐ |
| b. The proposed action may affect or is adjacent to a geological feature listed as a registered National Natural Landmark.<br>Specific feature: _____ | E3c | ☐ | ☐ |
| c.  Other impacts: _____<br>_____ | | ☐ | ☐ |

**3.  Impacts on Surface Water**

The proposed action may affect one or more wetlands or other surface water bodies (e.g., streams, rivers, ponds or lakes).  (See Part 1. D.2, E.2.h)        ☒ NO        ☐ YES

*If "Yes", answer questions a - l.  If "No", move on to Section 4.*

|  | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. The proposed action may create a new water body. | D2b, D1h | ☐ | ☐ |
| b. The proposed action may result in an increase or decrease of over 10% or more than a 10 acre increase or decrease in the surface area of any body of water. | D2b | ☐ | ☐ |
| c. The proposed action may involve dredging more than 100 cubic yards of material from a wetland or water body. | D2a | ☐ | ☐ |
| d. The proposed action may involve construction within or adjoining a freshwater or tidal wetland, or in the bed or banks of any other water body. | E2h | ☐ | ☐ |
| e. The proposed action may create turbidity in a waterbody, either from upland erosion, runoff or by disturbing bottom sediments. | D2a, D2h | ☐ | ☐ |
| f. The proposed action may include construction of one or more intake(s) for withdrawal of water from surface water. | D2c | ☐ | ☐ |
| g. The proposed action may include construction of one or more outfall(s) for discharge of wastewater to surface water(s). | D2d | ☐ | ☐ |
| h. The proposed action may cause soil erosion, or otherwise create a source of stormwater discharge that may lead to siltation or other degradation of receiving water bodies. | D2e | ☐ | ☐ |
| i. The proposed action may affect the water quality of any water bodies within or downstream of the site of the proposed action. | E2h | ☐ | ☐ |
| j. The proposed action may involve the application of pesticides or herbicides in or around any water body. | D2q, E2h | ☐ | ☐ |
| k. The proposed action may require the construction of new, or expansion of existing, wastewater treatment facilities. | D1a, D2d | ☐ | ☐ |

| l. Other impacts: _____ | | ☐ | ☐ |
| _____ | | | |

---

**4. Impact on groundwater**

The proposed action may result in new or additional use of ground water, or may have the potential to introduce contaminants to ground water or an aquifer.
(See Part 1. D.2.a, D.2.c, D.2.d, D.2.p, D.2.q, D.2.t)    ☑NO    ☐YES

*If "Yes", answer questions a - h.  If "No", move on to Section 5.*

| | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. The proposed action may require new water supply wells, or create additional demand on supplies from existing water supply wells. | D2c | ☐ | ☐ |
| b. Water supply demand from the proposed action may exceed safe and sustainable withdrawal capacity rate of the local supply or aquifer. Cite Source: _____ | D2c | ☐ | ☐ |
| c. The proposed action may allow or result in residential uses in areas without water and sewer services. | D1a, D2c | ☐ | ☐ |
| d. The proposed action may include or require wastewater discharged to groundwater. | D2d, E2l | ☐ | ☐ |
| e. The proposed action may result in the construction of water supply wells in locations where groundwater is, or is suspected to be, contaminated. | D2c, E1f, E1g, E1h | ☐ | ☐ |
| f. The proposed action may require the bulk storage of petroleum or chemical products over ground water or an aquifer. | D2p, E2l | ☐ | ☐ |
| g. The proposed action may involve the commercial application of pesticides within 100 feet of potable drinking water or irrigation sources. | E2h, D2q, E2l, D2c | ☐ | ☐ |
| h. Other impacts: _____ _____ | | ☐ | ☐ |

---

**5. Impact on Flooding**

The proposed action may result in development on lands subject to flooding.
(See Part 1. E.2)    ☑NO    ☐YES

*If "Yes", answer questions a - g.  If "No", move on to Section 6.*

| | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. The proposed action may result in development in a designated floodway. | E2i | ☐ | ☐ |
| b. The proposed action may result in development within a 100 year floodplain. | E2j | ☐ | ☐ |
| c. The proposed action may result in development within a 500 year floodplain. | E2k | ☐ | ☐ |
| d. The proposed action may result in, or require, modification of existing drainage patterns. | D2b, D2e | ☐ | ☐ |
| e. The proposed action may change flood water flows that contribute to flooding. | D2b, E2i, E2j, E2k | ☐ | ☐ |
| f. If there is a dam located on the site of the proposed action, is the dam in need of repair, or upgrade? | E1e | ☐ | ☐ |

| g. Other impacts: _____ | | ☐ | ☐ |
| _____ | | | |

---

**6.  Impacts on Air**
The proposed action may include a state regulated air emission source.     ☑NO     ☐YES
(See Part 1. D.2.f., D.2.h, D.2.g)
*If "Yes", answer questions a - f.  If "No", move on to Section 7.*

| | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. If  the proposed action requires federal or state air emission permits, the action may also emit one or more greenhouse gases at or above the following levels: | | | |
|     i.   More than 1000 tons/year of carbon dioxide ($CO_2$) | D2g | ☐ | ☐ |
|     ii.  More than 3.5 tons/year of nitrous oxide ($N_2O$) | D2g | ☐ | ☐ |
|     iii. More than 1000 tons/year of carbon equivalent of perfluorocarbons (PFCs) | D2g | ☐ | ☐ |
|     iv. More than .045 tons/year of sulfur hexafluoride ($SF_6$) | D2g | ☐ | ☐ |
|     v.  More than 1000 tons/year of carbon dioxide equivalent of hydrochloroflourocarbons (HFCs) emissions | D2g | ☐ | ☐ |
|     vi. 43 tons/year or more of methane | D2h | ☐ | ☐ |
| b. The proposed action may generate 10 tons/year or more of any one designated hazardous air pollutant, or 25 tons/year or more of any combination of such hazardous air pollutants. | D2g | ☐ | ☐ |
| c. The proposed action may require a state air registration, or may produce an emissions rate of total contaminants that may exceed 5 lbs. per hour, or may include a heat source capable of producing more than 10 million BTU's per hour. | D2f, D2g | ☐ | ☐ |
| d. The proposed action may reach 50% of any of the thresholds in "a" through "c", above. | D2g | ☐ | ☐ |
| e. The proposed action may result in the combustion or thermal treatment of more than 1 ton of refuse per hour. | D2s | ☐ | ☐ |
| f. Other impacts: _____ _____ | | ☐ | ☐ |

---

**7.   Impact on Plants and Animals**
The proposed action may result in a loss of flora or fauna.  (See Part 1. E.2. m.-q.)     ☑NO     ☐YES
*If "Yes", answer questions a - j.  If "No", move on to Section 8.*

| | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. The proposed action may cause reduction in population or loss of individuals of any threatened or endangered species, as listed by New York State or the Federal government, that use the site, or are found on, over, or near the site. | E2o | ☐ | ☐ |
| b. The proposed action may result in a reduction or degradation of any habitat used by any rare, threatened or endangered species, as listed by New York State or the federal government. | E2o | ☐ | ☐ |
| c. The proposed action may cause reduction in population, or loss of individuals, of any species of special concern or conservation need, as listed by New York State or the Federal government, that use the site, or are found on, over, or near the site. | E2p | ☐ | ☐ |
| d. The proposed action may result in a reduction or degradation of any habitat used by any species of special concern and conservation need, as listed by New York State or the Federal government. | E2p | ☐ | ☐ |

| | | | |
|---|---|---|---|
| e. The proposed action may diminish the capacity of a registered National Natural Landmark to support the biological community it was established to protect. | E3c | ☐ | ☐ |
| f. The proposed action may result in the removal of, or ground disturbance in, any portion of a designated significant natural community.<br>Source: _____ | E2n | ☐ | ☐ |
| g. The proposed action may substantially interfere with nesting/breeding, foraging, or over-wintering habitat for the predominant species that occupy or use the project site. | E2m | ☐ | ☐ |
| h. The proposed action requires the conversion of more than 10 acres of forest, grassland or any other regionally or locally important habitat.<br>Habitat type & information source: _____ | E1b | ☐ | ☐ |
| i. Proposed action (commercial, industrial or recreational projects, only) involves use of herbicides or pesticides. | D2q | ☐ | ☐ |
| j. Other impacts: _____ | | ☐ | ☐ |

**8.    Impact on Agricultural Resources**
    The proposed action may impact agricultural resources.  (See Part 1. E.3.a. and b.)    ☑NO    ☐ YES
    *If "Yes", answer questions a - h.  If "No", move on to Section 9.*

| | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. The proposed action may impact soil classified within soil group 1 through 4 of the NYS Land Classification System. | E2c, E3b | ☐ | ☐ |
| b. The proposed action may sever, cross or otherwise limit access to agricultural land (includes cropland, hayfields, pasture, vineyard, orchard, etc). | E1a, Elb | ☐ | ☐ |
| c. The proposed action may result in the excavation or compaction of the soil profile of active agricultural land. | E3b | ☐ | ☐ |
| d. The proposed action may irreversibly convert agricultural land to non-agricultural uses, either more than 2.5 acres if located in an Agricultural District, or more than 10 acres if not within an Agricultural District. | E1b, E3a | ☐ | ☐ |
| e. The proposed action may disrupt or prevent installation of an agricultural land management system. | El a, E1b | ☐ | ☐ |
| f. The proposed action may result, directly or indirectly, in increased development potential or pressure on farmland. | C2c, C3, D2c, D2d | ☐ | ☐ |
| g. The proposed project is not consistent with the adopted municipal Farmland Protection Plan. | C2c | ☐ | ☐ |
| h. Other impacts: _____ | | ☐ | ☐ |

Page **5** of 10

**9.**   **Impact on Aesthetic Resources**
The land use of the proposed action are obviously different from, or are in sharp contrast to, current land use patterns between the proposed project and a scenic or aesthetic resource.  (Part 1. E.1.a, E.1.b, E.3.h.)     ☑ NO   ☐ YES
*If "Yes", answer questions a - g.  If "No", go to Section 10.*

| | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. Proposed action may be visible from any officially designated federal, state, or local scenic or aesthetic resource. | E3h | ☐ | ☐ |
| b. The proposed action may result in the obstruction, elimination or significant screening of one or more officially designated scenic views. | E3h, C2b | ☐ | ☐ |
| c. The proposed action may be visible from publicly accessible vantage points:<br>  i. Seasonally (e.g., screened by summer foliage, but visible during other seasons)<br>  ii. Year round | E3h | ☐<br>☐ | ☐<br>☐ |
| d. The situation or activity in which viewers are engaged while viewing the proposed action is:<br>  i.  Routine travel by residents, including travel to and from work<br>  ii. Recreational or tourism based activities | E3h<br>E2q,<br>E1c | ☐<br>☐ | ☐<br>☐ |
| e. The proposed action may cause a diminishment of the public enjoyment and appreciation of the designated aesthetic resource. | E3h | ☐ | ☐ |
| f. There are similar projects visible within the following distance of the proposed project:<br>        0-1/2 mile<br>        ½ -3  mile<br>        3-5  mile<br>        5+   mile | D1a, E1a, D1f, D1g | ☐ | ☐ |
| g. Other impacts: _____<br>_____ | | ☐ | ☐ |

**10.**   **Impact on Historic and Archeological Resources**
The proposed action may occur in or adjacent to a historic or archaeological resource.  (Part 1. E.3.e, f. and g.)     ☑ NO   ☐ YES
*If "Yes", answer questions a - e.  If "No", go to Section 11.*

| | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a.  The proposed action may occur wholly or partially within, or substantially contiguous to, any buildings, archaeological site or district which is listed on the National or State Register of Historical Places, or that has been determined by the Commissioner of the NYS Office of Parks, Recreation and Historic Preservation to be eligible for listing on the State Register of Historic Places. | E3e | ☐ | ☐ |
| b. The proposed action may occur wholly or partially within, or substantially contiguous to, an area designated as sensitive for archaeological sites on the NY State Historic Preservation Office (SHPO) archaeological site inventory. | E3f | ☐ | ☐ |
| c. The proposed action may occur wholly or partially within, or substantially contiguous to, an archaeological site not included on the NY SHPO inventory.<br>  Source: _____ | E3g | ☐ | ☐ |

| | | No, or small impact may occur | Moderate to large impact may occur |
|---|---|:---:|:---:|
| d. Other impacts: _____<br>_____ | | ☐ | ☐ |
| e. If any of the above (a-d) are answered "Moderate to large impact may occur", continue with the following questions to help support conclusions in Part 3: | | | |
|    i.  The proposed action may result in the destruction or alteration of all or part of the site or property. | E3e, E3g, E3f | ☐ | ☐ |
|    ii.  The proposed action may result in the alteration of the property's setting or integrity. | E3e, E3f, E3g, E1a, E1b | ☐ | ☐ |
|    iii.  The proposed action may result in the introduction of visual elements which are out of character with the site or property, or may alter its setting. | E3e, E3f, E3g, E3h, C2, C3 | ☐ | ☐ |

**11.  Impact on Open Space and Recreation**
The proposed action may result in a loss of recreational opportunities or a reduction of an open space resource as designated in any  adopted municipal open space plan.
(See Part 1. C.2.c, E.1.c., E.2.q.)
*If "Yes", answer questions a - e.  If "No", go to Section 12.*

☑NO   ☐YES

| | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|:---:|:---:|
| a. The proposed action may result in an impairment of natural functions, or "ecosystem services", provided by an undeveloped area, including but not limited to stormwater storage, nutrient cycling, wildlife habitat. | D2e, E1b E2h, E2m, E2o, E2n, E2p | ☐ | ☐ |
| b. The proposed action may result in the loss of a current or future recreational resource. | C2a, E1c, C2c, E2q | ☐ | ☐ |
| c. The proposed action may eliminate open space or recreational resource in an area with few such resources. | C2a, C2c E1c, E2q | ☐ | ☐ |
| d. The proposed action may result in loss of an area now used informally by the community as an open space resource. | C2c, E1c | ☐ | ☐ |
| e.  Other impacts: _____ | | ☐ | ☐ |

**12.  Impact on Critical Environmental Areas**
The proposed action may be located within or adjacent to a critical environmental area (CEA).  (See Part 1. E.3.d)
*If "Yes", answer questions a - c.  If "No", go to Section 13.*

☑ NO   ☐ YES

| | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|:---:|:---:|
| a. The proposed action may result in a reduction in the quantity of the resource or characteristic which was the basis for designation of the CEA. | E3d | ☐ | ☐ |
| b. The proposed action may result in a reduction in the quality of the resource or characteristic which was the basis for designation of the CEA. | E3d | ☐ | ☐ |
| c. Other impacts: _____<br>_____ | | ☐ | ☐ |

**13. Impact on Transportation**

The proposed action may result in a change to existing transportation systems.          NO ☐   YES ☑
(See Part 1. D.2.j)

*If "Yes", answer questions a - f.  If "No", go to Section 14.*

|  | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. Projected traffic increase may exceed capacity of existing road network. | D2j | ☑ | ☐ |
| b. The proposed action may result in the construction of paved parking area for 500 or more vehicles. | D2j | ☑ | ☐ |
| c. The proposed action will degrade existing transit access. | D2j | ☑ | ☐ |
| d. The proposed action will degrade existing pedestrian or bicycle accommodations. | D2j | ☑ | ☐ |
| e. The proposed action may alter the present pattern of movement of people or goods. | D2j | ☑ | ☐ |
| f. Other impacts: Diversion resulting from the proposed action may result in a change of activity at nearby airports and surrounding roadways. |  | ☑ | ☐ |

**14. Impact on Energy**

The proposed action may cause an increase in the use of any form of energy.          NO ☐   YES ☑
(See Part 1. D.2.k)

*If "Yes", answer questions a - e.  If "No", go to Section 15.*

|  | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. The proposed action will require a new, or an upgrade to an existing, substation. | D2k | ☑ | ☐ |
| b. The proposed action will require the creation or extension of an energy transmission or supply system to serve more than 50 single or two-family residences or to serve a commercial or industrial use. | D1f, D1q, D2k | ☑ | ☐ |
| c. The proposed action may utilize more than 2,500 MWhrs per year of electricity. | D2k | ☑ | ☐ |
| d. The proposed action may involve heating and/or cooling of more than 100,000 square feet of building area when completed. | D1g | ☑ | ☐ |
| e. Other Impacts: Closure of Airport may alter where aviation fuel is available for purchase. Diversion impacts could temporarily affect amount of fuel demand. |  | ☑ | ☐ |

**15. Impact on Noise, Odor, and Light**

The proposed action may result in an increase in noise, odors, or outdoor lighting.          NO ☐   YES ☑
(See Part 1. D.2.m., n., and o.)

*If "Yes", answer questions a - f.  If "No", go to Section 16.*

|  | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. The proposed action may produce sound above noise levels established by local regulation. | D2m | ☑ | ☐ |
| b. The proposed action may result in blasting within 1,500 feet of any residence, hospital, school, licensed day care center, or nursing home. | D2m, E1d | ☑ | ☐ |
| c. The proposed action may result in routine odors for more than one hour per day. | D2o | ☐ | ☐ |

Page **8** of **10**

| | | | |
|---|---|---|---|
| d. The proposed action may result in light shining onto adjoining properties. | D2n | ☑ | ☐ |
| e. The proposed action may result in lighting creating sky-glow brighter than existing area conditions. | D2n, E1a | ☐ | ☐ |
| f. Other impacts: Closure of Airport could lead to diversion of aircraft to nearby airports with an associated increase in noise impacts to those airports. | | ☑ | ☐ |

## 16. Impact on Human Health

The proposed action may have an impact on human health from exposure to new or existing sources of contaminants. (See Part 1.D.2.q., E.1. d. f. g. and h.)    ☑ NO    ☐ YES

*If "Yes", answer questions a - m. If "No", go to Section 17.*

| | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. The proposed action is located within 1500 feet of a school, hospital, licensed day care center, group home, nursing home or retirement community. | E1d | ☐ | ☐ |
| b. The site of the proposed action is currently undergoing remediation. | E1g, E1h | ☐ | ☐ |
| c. There is a completed emergency spill remediation, or a completed environmental site remediation on, or adjacent to, the site of the proposed action. | E1g, E1h | ☐ | ☐ |
| d. The site of the action is subject to an institutional control limiting the use of the property (e.g., easement or deed restriction). | E1g, E1h | ☐ | ☐ |
| e. The proposed action may affect institutional control measures that were put in place to ensure that the site remains protective of the environment and human health. | E1g, E1h | ☐ | ☐ |
| f. The proposed action has adequate control measures in place to ensure that future generation, treatment and/or disposal of hazardous wastes will be protective of the environment and human health. | D2t | ☐ | ☐ |
| g. The proposed action involves construction or modification of a solid waste management facility. | D2q, E1f | ☐ | ☐ |
| h. The proposed action may result in the unearthing of solid or hazardous waste. | D2q, E1f | ☐ | ☐ |
| i. The proposed action may result in an increase in the rate of disposal, or processing, of solid waste. | D2r, D2s | ☐ | ☐ |
| j. The proposed action may result in excavation or other disturbance within 2000 feet of a site used for the disposal of solid or hazardous waste. | E1f, E1g E1h | ☐ | ☐ |
| k. The proposed action may result in the migration of explosive gases from a landfill site to adjacent off site structures. | E1f, E1g | ☐ | ☐ |
| l. The proposed action may result in the release of contaminated leachate from the project site. | D2s, E1f, D2r | ☐ | ☐ |
| m. Other impacts: _____ _____ | | | |

**17. Consistency with Community Plans**

The proposed action is not consistent with adopted land use plans.   ☑ NO   ☐ YES
(See Part 1. C.1, C.2. and C.3.)
*If "Yes", answer questions a - h.  If "No", go to Section 18.*

|  | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. The proposed action's land use components may be different from, or in sharp contrast to, current surrounding land use pattern(s). | C2, C3, D1a E1a, E1b | ☐ | ☐ |
| b. The proposed action will cause the permanent population of the city, town or village in which the project is located to grow by more than 5%. | C2 | ☐ | ☐ |
| c. The proposed action is inconsistent with local land use plans or zoning regulations. | C2, C2, C3 | ☐ | ☐ |
| d. The proposed action is inconsistent with any County plans, or other regional land use plans. | C2, C2 | ☐ | ☐ |
| e. The proposed action may cause a change in the density of development that is not supported by existing infrastructure or is distant from existing infrastructure. | C3, D1c, D1d, D1f, D1d, E1b | ☐ | ☐ |
| f. The proposed action is located in an area characterized by low density development that will require new or expanded public infrastructure. | C4, D2c, D2d D2j | ☐ | ☐ |
| g. The proposed action may induce secondary development impacts (e.g., residential or commercial development not included in the proposed action) | C2a | ☐ | ☐ |
| h. Other: _____ _____ |  | ☐ | ☐ |

**18. Consistency with Community Character**

The proposed project is inconsistent with the existing community character.   ☑ NO   ☐ YES
(See Part 1. C.2, C.3, D.2, E.3)
*If "Yes", answer questions a - g.  If "No", proceed to Part 3.*

|  | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. The proposed action may replace or eliminate existing facilities, structures, or areas of historic importance to the community. | E3e, E3f, E3g | ☐ | ☐ |
| b. The proposed action may create a demand for additional community services (e.g. schools, police and fire) | C4 | ☐ | ☐ |
| c. The proposed action may displace affordable or low-income housing in an area where there is a shortage of such housing. | C2, C3, D1f D1g, E1a | ☐ | ☐ |
| d. The proposed action may interfere with the use or enjoyment of officially recognized or designated public resources. | C2, E3 | ☐ | ☐ |
| e. The proposed action is inconsistent with the predominant architectural scale and character. | C2, C3 | ☐ | ☐ |
| f. Proposed action is inconsistent with the character of the existing natural landscape. | C2, C3 E1a, E1b E2g, E2h | ☐ | ☐ |
| g. Other impacts: _____ _____ |  | ☐ | ☐ |

PRINT FULL FORM                        Page **10** of **10**

## Full Environmental Assessment Form
### Part 3 - Evaluation of the Magnitude and Importance of Project Impacts
### and
### Determination of Significance

Part 3 provides the reasons in support of the determination of significance.  The lead agency must complete Part 3 for every question in Part 2 where the impact has been identified as potentially moderate to large or where there is a need to explain why a particular element of the proposed action will not, or may, result in a significant adverse environmental impact.

Based on the analysis in Part 3, the lead agency must decide whether to require an environmental impact statement to further assess the proposed action or whether available information is sufficient for the lead agency to conclude that the proposed action will not have a significant adverse environmental impact.  By completing the certification on the next page, the lead agency can complete its determination of significance.

**Reasons Supporting This Determination:**
To complete this section:
- Identify the impact based on the Part 2 responses and describe its magnitude.  Magnitude considers factors such as severity, size or extent of an impact.
- Assess the importance of the impact.  Importance relates to the geographic scope, duration, probability of the impact occurring, number of people affected by the impact and any additional environmental consequences if the impact were to occur.
- The assessment should take into consideration any design element or project changes.
- Repeat this process for each Part 2 question where the impact has been identified as potentially moderate to large or where there is a need to explain why a particular element of the proposed action will not, or may, result in a significant adverse environmental impact.
- Provide the reason(s) why the impact may, or will not, result in a significant adverse environmental impact
- For Conditional Negative Declarations identify the specific condition(s) imposed that will modify the proposed action so that no significant adverse environmental impacts will result.
- Attach additional sheets, as needed.

No responses in the EAF Part 2 identified any potentially moderate to large impacts. The responses to three (3) questions identified potentially small impacts. These responses pertained to the questions regarding (13) Transportation; (14) Energy; and (15) Noise, Odor, and Light. Each of these potential impacts were thoroughly described and assessed in the attached Environmental Assessment Form Part 2 and Part 3 Supplemental Information. The assessment has found that the Action will have very small, insignificant or temporary impacts on these resources as summarized below.

Impact on Transportation- Closing the Airport and opening a New Airport 3 days later could have potential diversion impacts on nearby airports and other modes of transportation. To address this potential impact, an assessment of the historic operations at East Hampton Airport and each of the 4 nearby airports was conducted. The period during which no airport will be available corresponds to the historically lowest levels of aircraft activity at East Hampton Airport- approximately 22 operations per day. The absence of an airport during this limited period of time of low historic activity corresponds to the time period when there will be the least amount of potential diversion impacts to other airports and other modes of transportation. In short, the analysis conducted concluded that in the time period during which no airport will be available in East Hampton, a very minor amount of traffic could be expected to divert to some of the nearby airports. The small amount of potential diverted aircraft represents a fraction of the increase in operations that each nearby airport experiences during peak season. Similarly, the potential increase in automobiles and ground transportation that could potentially result from the airport closure could be accommodated easily by the existing road network.

Impact on  Energy- The 3-day time period when an airport is not available is expected to reduce the amount of aircraft fuel purchased at East Hampton Airport. Of the nearby airports, only Gabreski offers aircraft refueling. Thus, during the 3-day period, some additional fueling may occur at Gabreski. Compared to the size of operations at Gabreski, 63,602 operations in 2018, the potential fueling requirements to meet the demand from aircraft diverted is assessed as negligible.

Impact on Noise, Odor or Light- During the 3-day period when an airport is not available at East Hampton, the annoyance and disturbance from aircraft noise in the community and along the flight paths separating East Hampton from New York City will be greatly reduced. Noise impacts to surrounding airports resulting from potential diversion of aircraft during this 3-day time period was assessed as minimal for 3 reasons: (1) The analysis in the Transportation Impact section revealed there would be very little diversion of aircraft during this time period. (2) Noise complaints logged with the Town noise hotline are overwhelmingly attributable to helicopters. Few if any helicopters have historically operated in or out of East Hampton during the 3-day time period. (3) The majority, or 66% of the aircraft that historically operated at the Airport during the contemplated 3-day period of time are small, piston-driven planes. Generally, the East Hampton public and citizens from surrounding communities had not complained about the noise and disturbances from small piston-driven planes.

In short, no moderate or large impacts have been identified. The few small potential impacts have been identified, analyzed and found to be short term, extremely small or insignificant.

## Determination of Significance - Type 1 and Unlisted Actions

SEQR Status:   ☐ Type 1       ☑ Unlisted

Identify portions of EAF completed for this Project:   ☑ Part 1       ☑ Part 2       ☑ Part 3

FEAF 2019

Upon review of the information recorded on this EAF, as noted, plus this additional support information

Supplemental Information attached to EAF Parts 2 and 3.

_____

_____

and considering both the magnitude and importance of each identified potential impact, it is the conclusion of the

East Hampton Town Board
_____ as lead agency that:

☑ A.   This project will result in no significant adverse impacts on the environment, and, therefore, an environmental impact statement need not be prepared.  Accordingly, this negative declaration is issued.

☐ B.   Although this project could have a significant adverse impact on the environment, that impact will be avoided or substantially mitigated because of the following conditions which will be required by the lead agency:

_____

_____

_____

_____

There will, therefore, be no significant adverse impacts from the project as conditioned, and, therefore, this conditioned negative declaration is issued.  A conditioned negative declaration may be used only for UNLISTED actions (see 6 NYCRR 617.7(d)).

☐ C.   This Project may result in one or more significant adverse impacts on the environment, and an environmental impact statement must be prepared to further assess the impact(s) and possible mitigation and to explore alternatives to avoid or reduce those impacts.  Accordingly, this positive declaration is issued.

| | |
|---|---|
| Name of Action: East Hampton Airport Conversion | |
| Name of Lead Agency: East Hampton Town Board | |
| Name of Responsible Officer in Lead Agency: Peter Van Scoyoc | |
| Title of Responsible Officer:  Town Supervisor | |
| Signature of Responsible Officer in Lead Agency: | Date:   January  , 2022 |
| Signature of Preparer (if different from Responsible Officer) Lisa Liquori, President, Fine Arts & Sciences LLC | Date:   January  , 2022 |

**For Further Information:**

Contact Person: Peter Van Scoyoc

Address: East Hampton Town Hall; 159 Pantigo Road; East Hampton, N.Y. 11937

Telephone Number: 631-324-4141

E-mail: PVanScoyoc@ehamptonny.gov

**For Type 1 Actions and Conditioned Negative Declarations, a copy of this Notice is sent to:**

Chief Executive Officer of the political subdivision in which the action will be principally located (e.g., Town / City / Village of)
Other involved agencies (if any)
Applicant (if any)
Environmental Notice Bulletin:  http://www.dec.ny.gov/enb/enb.html

PRINT FULL FORM                    Page 2 of 2